In the Matter of **UNITED STATES**
of America

v.

**O. G. ROYSTER.**

**No. 26079.**

United States District Court
N. D. Ohio, E. D.
Nov. 8, 1961.

Merle M. McCurdy, U. S. Dist. Atty.,
Burt W. Griffin, Asst. U. S. Dist. Atty.,
for plaintiff.

Rodney V. Coleman, Cleveland, Ohio,
for defendant.

McNAMEE, District Judge.

Defendant moves to suppress counterfeit money or obligations of the United States, particularly one Federal Reserve note Serial No. D–7998951–B, obtained by officers of the Cleveland Police Department on September 10, 1961, while

searching the home of defendant without a search warrant and without a warrant for his arrest. Defendant moves further that all oral or written statements made by him to officers of the Cleveland Police Department or agents of the United States Government be suppressed because at the time he made such statements he was being held illegally in jail and denied the right to communicate with members of his family or with his counsel. Defendant further asserts that statements made by him were induced by threats of punishment and promises of leniency; that he was not informed of his right to remain silent but was in fact coerced into making said statements.

The pertinent facts as found from the evidence offered on behalf of the defendant and the Government may be stated as follows: At about 9:15 on Sunday evening, September 10th, 1961, Patrolman Governor N. Foust of the Cleveland Police Department arrested Sid Hardy and Clarence Steele immediately after they had passed a counterfeit five dollar Federal Reserve note in a restaurant. Investigation at that time disclosed that both Hardy and Steele were in possession of additional counterfeit obligations of the United States. Upon arrival at the police station Hardy refused to talk but Steele gave Officer Foust the following information:

That $18,000 of counterfeit money was stored in a common garage situated on two lots in the rear of two houses on East 97th Street south of Cedar Avenue in the City of Cleveland; that O. G. Royster, who lived in one of the houses, told Steele that the counterfeit money in the garage belonged to his next door neighbor. Steele did not know the name of the reputed owner of the counterfeit money but described his appearance to Foust. Steele also told Foust that on one occasion he had gone to the unnamed man's quarters with Royster and Hardy, at which time the man gave counterfeit money to Royster and Royster handed the money to Hardy. At the time Hardy was "booked" he gave his address as 2269 East 97th Street, which was the address at which Royster lived. Royster's home was about three miles distant from the place where Hardy and Steele were arrested. Foust conveyed to his superior officers the information he had received from Steele. Some time after 11:00 P.M. that same evening a group of nine Cleveland police officers under the leadership of Sergeant Vrabel went to the immediate neighborhood of the Royster house. Five of the officers took positions at various points outside Royster's home and the house adjacent thereto. The downstairs of the Royster home was well lighted and four officers sought entrance. In response to the knock of Officer Foust, who was in uniform, the front door was opened by a young girl about 8 or 9 years of age who was accompanied by a young woman. All the police officers identified themselves as such and inquiry was made whether O. G. Royster was in. Upon receiving an affirmative answer the officers stated they wanted to talk with him and were admitted. Upon admittance they were informed that O. G. Royster was upstairs. Mrs. Royster appeared at the top of the stairs and confirmed the fact that Royster was upstairs in his bedroom. The officers proceeded upstairs and accompanied by Mrs. Royster they went to a bedroom where they met Royster who was clothed in trousers and an undershirt. Apparently Royster had been aroused from sleep at the time the officers entered the house. There is a sharp conflict in the evidence as to the events that followed. Defendant and his witnesses stated in substance that one of the police officers, presumably Sergeant Vrabel, forcibly abstracted a wallet from the rear pocket of Royster's trousers, after which he searched the wallet and found three counterfeit ten dollar bills therein. The more reasonable and credible version of the events that occurred in Royster's bedroom, which I accept as true, was given by Sergeant Vrabel and the other police officers and may be stated thus: After the four officers and Mr. and Mrs. Royster entered the bedroom, Sergeant Vrabel asked Royster for some

form of identification. Royster took his wallet from the rear pocket of his trousers and started to thumb over several cards in an open pocket of the wallet. He was extremely nervous, his hands were shaking and he was unable to select any identification card. Sergeant Vrabel, who stood about a foot away from Royster, was aware of the latter's nervous condition and said "Well, can I help you with that? May I see it?" Royster then handed his wallet to Vrabel who, after a cursory inspection of the identification cards, unzipped a closed pocket of the wallet and found therein three counterfeit ten dollar bills. Upon being questioned Royster said he had won the bills while in a crap game. In this connection Sergeant Vrabel testified as follows:

"He says that he had got it earlier in the week in a crap game. I told him that as a result of this money, having possession of this money, he was under arrest, and that we would further investigate the matter, that he would have to go downtown with us. I asked him at the time also whether or not there was any more of this counterfeit money on his premises. He said that there wasn't, and that if we would like to look around we certainly could, if we wanted to search we could. I told him we would have to search as a result of finding this money, and I instructed the men to search the premises."

No additional counterfeit money was found as a result of a search of the premises. After Royster was placed under arrest members of his family called three friends to aid and assist him in procuring a lawyer. All three of these men were arrested when they came upon the premises and were not released from jail until after they were interrogated by a United States Secret Service Officer on the afternoon of the following day. Defendant was taken to jail in the early morning hours of Monday, September 11th, 1961, but it was not until 11:00 A.M. Wednesday, September 13th, that he was brought before a United States Commissioner. Royster gave no written statement. At about 4 P.M. Monday, September 11, 1961, he was interviewed by Secret Service Agent Dobeck, to whom he repeated his statement to Vrabel that he received the money while gambling and added that on one occasion he had attempted to pass one of the bills. The officers had no search warrant and no warrant of arrest at the time they entered Royster's home on Sunday, September 10th, 1961, and could not have obtained such warrant, there being no judge or magistrate available at the time. Royster received a ninth grade education in the state of Alabama. Prior to the night in question he had never been arrested.

## DISCUSSION

The Government defends the search on the following grounds submitted in the alternative: (a) That probable cause for Royster's arrest which existed prior to the time he relinquished possession of his wallet was sufficient to justify the search even though no actual arrest had been made at that time; (b) That defendant waived his constitutional immunity under the Fourth Amendment and consented to the search; (c) Under the exceptional circumstances existing at the time, the search without a warrant was reasonable. The foregoing grounds will be discussed in the order stated above.

### (a)

When incident to a lawful arrest with or without a warrant, a search without a warrant is reasonable. Johnson v. U. S., 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436; Giordenello v. U. S., 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503; Draper v. U. S., 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327. Heretofore in all such cases a lawful arrest has been regarded as an essential prerequisite to the incidental search. The Government contends, however, that "It is irrelevant that the police did not actually arrest Royster prior to searching him so long as probable cause for the arrest existed." For the requirement of a lawful arrest

antecedent the search, the Government would substitute proof of probable cause for arrest as the criterion by which to determine the legality of a search without a warrant. This cannot be done. The law of arrest is governed by statutory provisions defining conditions under which a warrant of arrest may issue and those upon which arrests without a warrant may be made. The law of search is governed by the Fourth Amendment as construed by the Supreme Court of the United States. As thus construed, the Fourth Amendment outlaws all searches made without a warrant excepting those incident to a lawful arrest. It has been suggested but not adjudicated that searches made in exceptional circumstances would be considered valid. Johnson v. U. S., 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436; McDonald v. U. S., 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153. In his instructive dissent in U. S. v. Rabinowitz, 339 U.S. 56, 70, 70 S.Ct. 430, 94 L.Ed. 653, Mr. Justice Frankfurter points out that the Fourth Amendment bans all searches without a warrant except those grounded in necessity. He declares that the right to search without a warrant as an incident to a lawful arrest is a narrow exception to the prohibition of the Fourth Amendment and has its roots in necessity. The necessity in such cases arises from the need to protect the arresting officer, to deprive the prisoner of potential means of escape and to prevent the destruction of evidence by the person arrested. Ibid. 72, 70 S.Ct. 430. The necessity which justifies a search incident to an arrest does not and can not arise until an actual arrest is made. It is apparent, therefore, that a lawful arrest is an indispensable prerequisite to a valid search incident thereto. There being no evidence of arrest preceding the search, the issue of probable cause for arrest is not reached. There was no ambiguity in the testimony of Sergeant Vrabel when he said: "I told him (Royster) that as a result of the money, having possession of this money, he was under arrest * * *." Vrabel definitely linked the arrest to the prior search. The search was not an incident to the arrest but the arrest was incident to the search. In other cases arising upon similar circumstances the search has been held invalid. Lee v. U. S., 98 U.S.App.D.C. 97, 232 F.2d 354, and cases cited therein, at 356. The facts in the Lee case are accurately epitomized in Headnote No. 1 as follows:

"Where police went to apartment of defendant without a search warrant for purpose of checking on tip that stolen guns were there, and, on verifying that tip, they arrested defendant, the search was not incident to the arrest, but rather the arrest was incident to the search, and the search and seizure of the guns were unlawful under the Fourth Amendment to the Federal Constitution. U.S.C.A.Const. Amend. 4."

█ The facts of Lee are closely analogous to those of the case at bar and the principles applied in the cited case are applicable here with like result. It should be added that a search without a warrant cannot be justified by what it turns up. U. S. v. Di Re, 332 U.S. 581, 68 S.Ct. 222, 92 L.Ed. 210; Byars v. U. S., 273 U.S. 28, 47 S.Ct. 248, 71 L.Ed. 520.

(b)

█ While a person may waive rights guaranteed by the Constitution the Supreme Court has said that "'courts indulge every reasonable presumption against waiver' of fundamental constitutional rights" and do not presume acquiescence in the loss of such rights. Johnson v. Zerbst, 304 U.S. 458, at 464, 58 S.Ct. 1019, 82 L.Ed. 1461. Permission to search given pursuant to a demand by Government officers was held impliedly coercive and not a waiver of constitutional rights. Amos v. U. S., 255 U.S. 313, 41 S.Ct. 266, 65 L.Ed. 654. Permission to enter premises obtained under color of office was considered by the Supreme Court to be mere submission to authority rather than a waiver of constitutional rights. Johnson v. U. S., 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed.

436. In numerous cases the courts have considered a search without a warrant to which no objection was made as a mere peaceful submission to authority. U. S. v. Alberti, D.C., 120 F.Supp. 171; U. S. v. Slusser, D.C., 270 F. 818. Even where verbal consent was given in such cases, courts have held that the apparent consent was invalid as induced by compulsion or duress. U. S. v. Busby, D.C., 126 F.Supp. 845; Catalanotte v. U. S., 208 F.2d 264 (6th Cir.). In the last cited case the defendant, while descending the basement stairs of his home with police officers, said "The house is yours. You won't find any narcotics here." In holding the apparent consent to search invalid, Judge Martin, speaking for a unanimous court, said:

> "In the circumstances of this case, we are unable to construe the statements of appellant to the raiding officers—state and federal—that 'the house is yours' and that 'you won't find any narcotics here' as an invitation, or consent, by him that his home be searched for narcotics. He had probable cause to consider himself under duress, or even under arrest, at the time he made these statements. Without warrant of law and in violation of the Federal Constitution the officers had invaded his 'castle' and were actually in possession of it at the time appellant made the statements. It is a reasonable assumption that almost any person, when a group of police officers had barged into his home in the dead of night indicating strongly that he was under investigation for crime, would be frightened into inviting the officers to go ahead and search his premises. We have noted with disapproval the growing tendency on the part of police officers to be very quick on the trigger in construing—and acting upon their construction—a statement of some known offender as an invitation to search his premises. The present case is a rather extreme example of this tendency; and the action of the officers involved herein is disapproved."

See also Judd v. U. S., 89 U.S. App.D.C. 64, 190 F.2d 649, and cases cited therein. Whether consent to search without a warrant was freely and voluntarily given must be determined upon a consideration of all relevant facts and circumstances. Here four police officers went to Royster's home to check the information received from Steele. Upon entering the house the officers went directly to Royster's bedroom instead of waiting for him to come downstairs. Although they had twice been told that O. G. Royster was upstairs, the officers immediately sought confirmation of his identity when they entered his bedroom. As Royster opened his wallet to the pocket containing identification cards his hands were shaking, he was fumbling the cards and was unable to select any of them. It was then that Sergeant Vrabel said, "Well, can I help you with that? May I see it?" Sergeant Vrabel undoubtedly speaks truthfully when he says that pockets of the type in which the money was found often contain identification cards. But obviously his interest in securing further identification of Royster was subordinate to his interest in ascertaining whether the defendant had any counterfeit bills in his possession. By no stretch of logic can it be said that Royster consented to the search of the closed pocket of his wallet. In reliance upon Sergeant Vrabel's indicated purpose to help in the examination of the identification cards, Royster relinquished possession of his wallet. But Vrabel gave Royster no help in this regard. The Sergeant wasted no time in examining identification cards. He knew only that one of them was a Social Security card but he did not see the name appearing thereon. Upon receipt of the wallet he quickly unzipped the closed pocket of the billfold and found the three counterfeit bills. The record shows overwhelmingly that this was done without the permission or consent of Royster. The evidence presents the picture of a man of limited education who had not previously been

arrested, who was aroused out of a sleep at or near the hour of midnight on Sunday and surrounded by four police officers as he stood partially clad in his bedroom. He was aware of the counterfeit money in his wallet. He was a badly frightened and intimidated man, plainly in no position to do other than submit without protest to the authority of the police officers. In circumstances far less coercive in their effect upon persons suspected of crime courts have denied the Government's claim that consent to search was voluntarily given. Upon the facts of this case the Government's claim that defendant consented to the search should be and is denied.

### (c)

▉ In support of its contention that the search was made in "exceptional circumstances" the Government relies upon dicta in U. S. v. Johnson, supra; McDonald v. U. S., supra, and Chapman v. U. S., 365 U.S. 610, 81 S.Ct. 776, 5 L.Ed. 2d 828. In Johnson, the court said:

> "There are exceptional circumstances in which, on balancing the need for effective law enforcement against the right of privacy, it may be contended that a magistrate's warrant for search may be dispensed with."

It was suggested in that case that exceptional circumstances might exist where a suspect was fleeing or likely to take flight, or where it appears that the evidence or contraband was threatened with removal or destruction or where the search was of a moving vehicle. In McDonald it was said:

> "We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutional mandate that the exigencies of the situation made that course imperative." (335 U.S. p. 456, 69 S.Ct. p. 193.)

It is true that probably no search warrant could have been obtained on the Sunday night in question. It is agreed that no judicial officer was available for that purpose. But here there was no emergency justifying haste in proceeding to Royster's home for the purpose of verifying the information received from Steele. Royster was not preparing to take flight. He was in bed before the officers arrived. Nor was there any threat of removal or destruction of the counterfeit bills under Royster's control prior to the invasion of his home by the police officers. It does not appear that at that time Royster had knowledge of the arrest of Hardy and Steele nor did he have any reason to suspect that these men had been arrested. It is unlikely that Royster would have learned of the arrest of Hardy and Steele until the following day. Until he acquired such knowledge there was no reason for Royster to suspect that either Hardy or Steele had involved him in a scheme to pass counterfeit money. Surveillance during the night of the premises and the garage in which the counterfeit bills were presumably stored would have enabled the officers to prevent flight and to verify the information received from Steele. In any event there seemed to be little likelihood of such a material change in the "exigencies of the situation" as would make the course taken by the officers "imperative."

The Government contends that Sergeant Vrabel was not searching Royster's billfold for counterfeit money but was looking for evidence of identification of Royster. Being uncertain of the validity of this argument, the Government added that undoubtedly Vrabel hoped he would find counterfeit money "but such was an ultimate and not an immediate purpose." As indicated above, at the time Sergeant Vrabel obtained defendant's wallet his primary interest was in searching for counterfeit bills.

The evidence does not show "exceptional circumstances" imperatively requiring the action taken by the officers.

Defendant's Motion to Suppress as evidence the counterfeit money taken from the wallet of O. G. Royster is granted.

## MOTION TO SUPPRESS ORAL OR WRITTEN STATEMENTS MADE WHILE DEFENDANT WAS IN JAIL

■ Rule 5(a) of the Federal Rules of Criminal Procedure, 18 U.S.C.A. provides in part:

"An officer making an arrest under a warrant issued upon a complaint or any person making an arrest without a warrant shall take the arrested person without unnecessary delay before the nearest available commissioner or before any other nearby officer empowered to commit persons charged with offenses against the laws of the United States."

In Mallory v. U. S., 354 U.S. 449, 453, 77 S.Ct. 1356, 1 L.Ed.2d 1479, the court referred to and quoted at length from its opinion in McNabb v. U. S., 318 U.S. 332, 343, 344, 63 S.Ct. 608, 87 L.Ed. 819, and spelled out the reasons supporting the decision in McNabb as follows:

"the Court held that police detention of defendants beyond the time when a committing magistrate was readily accessible constituted 'willful disobedience of law.' In order adequately to enforce the congressional requirement of prompt arraignment, it was deemed necessary to render inadmissible incriminating statements elicited from defendants during a period of unlawful detention."

In Upshaw v. U. S., 335 U.S. 410, 69 S.Ct. 170, 93 L.Ed. 100, decided after the Federal Rules of Criminal Procedure had been adopted, the court held that the standard of "without unnecessary delay" in Rule 5(a) implied no relaxation of the McNabb doctrine. In Mallory the court also said:

"The next step in the proceeding is to arraign the arrested person before a judicial officer as quickly as possible so that he may be advised of his rights and so that the issue of probable cause may be promptly determined. The arrested person may, of course, be 'booked' by the police. But he is not to be taken to police headquarters in order to carry out a process of inquiry that lends itself, even if not so designed, to eliciting damaging statements to support the arrest and ultimately his guilt." (354 U.S. at p. 454, 77 S.Ct. at p. 1359.)

And again, at p. 455, 77 S.Ct. at p. 1359:

"The duty enjoined upon arresting officers to arraign 'without unnecessary delay' indicates that the command does not call for mechanical or automatic obedience. Circumstances may justify a brief delay between arrest and arraignment, as for instance, where the story volunteered by the accused is susceptible of quick verification through third parties. But the delay must not be of a nature to give opportunity for the extraction of a confession."

As already shown, defendant was arrested close to the hour of midnight September 10th, 1961, and was not arraigned before a commissioner until 11:00 A.M. September 13th, 1961. At 4:00 P.M. on September 11th, about 16 hours after his arrest and about 7 hours after the time when a commissioner would customarily be available, he was interviewed in jail by a Secret Service agent to whom he repeated the story told Sergeant Vrabel that he had received the counterfeit bills while gambling and added—that he had tried on one occasion to pass one of the counterfeit bills. The latter statement, which implies fraudulent intent, was the only incriminating declaration, oral or written, of the defendant. No claim is made of any impropriety in the method of interrogation pursued by the Secret Service agent on the afternoon of September 11th. The sole question is whether the failure to arraign defendant before 4:00 P.M. on September 11th constituted a violation of Rule 5 of the Federal Rules of Criminal Procedure. After his arrest and before being taken to jail defendant was denied the opportunity to obtain the aid of friends in securing the

services of a lawyer. As shown by the Statement of Facts, after he was placed under arrest defendant's wife 'phoned three of his friends, informed them of defendant's plight and sought their aid and assistance in obtaining the services of a lawyer. As each man who was called came to Royster's house he was placed under arrest and later taken to jail. Before speaking with the defendant on Monday afternoon, September 11th, the Secret Service agent interviewed the three men who were arrested at Royster's home and immediately thereafter directed their release from jail. The arbitrary action of the police in arresting the three men served no purpose except to frustrate defendant's prompt efforts before being incarcerated, to obtain the aid and assistance of counsel.

On Monday, September 11th, a lawyer was engaged to represent the defendant. On the afternoon of that day the lawyer was denied permission by the police to visit the defendant in jail on the ground that he was then being interviewed by federal officers. It was not until 11 A.M. Tuesday, September 12th—35 hours after defendant's arrest—that his lawyer received permission from the police to visit him. The accused had told no story "susceptible of quick verification to third parties" nor does the evidence disclose any other circumstance justifying delay in taking the defendant before a commissioner prior to the time he was interviewed by a United States Secret Service Agent on the afternoon of September 11th. Nor was there any justification for denying the defendant prompt opportunity to consult with his lawyer. When a defendant is arraigned as provided in Rule 5, the Commissioner, among other duties, is required to "inform the defendant that he is not required to make a statement and that any statement made by him may be used against him. The commissioner shall allow the defendant reasonable time and opportunity to consult counsel and shall admit the defendant to bail as provided in these rules." One of the purposes of the rule is to secure to persons arrested a speedy opportunity to learn their rights under the law. Defendant was denied such opportunity and was unable to learn of his rights by consultation with a lawyer until after he had made the incriminating statement noted above. Under the rule as construed in Mallory it follows that the motion to suppress the oral incriminating statement of defendant should be and is granted.

An order may be prepared in accordance with the foregoing.