Arthur Lee HURST, Petitioner,

v.

The PEOPLE OF the STATE OF CALIFORNIA, Robert A. Heinze, Warden, et al., Respondents.

Civ. No. 8507.

United States District Court
N. D. California, N. D.

Dec. 6, 1962.

Arthur Lee Hurst, in pro. per.

Stanley Mosk, Atty. Gen. of California, Sacramento, Cal., for respondents.

HALBERT, District Judge.

Petitioner has filed with this Court an application for a writ of habeas corpus, pursuant to the provisions of Title 28

U.S.C. § 2241(c) (3), seeking his release from the California State Prison at Folsom. He is presently incarcerated in said prison under a commitment of the Superior Court of the State of California, in and for the County of Los Angeles, pursuant to a conviction on two counts of violation of California Health and Safety Code, § 11500 [possession of narcotics other than marijuana] (See: People v. Hurst, 183 Cal.App.2d 379, 6 Cal.Rptr. 483). From the record, it is clear that petitioner is a State prisoner, and is not imprisoned under any Federal law.

This Court issued its order to show cause on July 30, 1962, based upon the facts alleged in petitioner's application. Pursuant to said order the State of California, through its representative the Attorney General, has filed a reply. Petitioner has filed a traverse thereto. A recitation of the facts in this case, as found by the State courts, is appropriate at this point.

At about 3:30 p. m. on May 18, 1959, Officer Garrahan of the Los Angeles Police Department received an anonymous telephone call at the Narcotics Division office in the Police Building. The person on the telephone stated, "If you want to find two pounds of marijuana, look under the house at 309 West 83d Street," and hung up. Garrahan testified that the voice sounded like that of a female, and that he had not heard it before.

Garrahan, along with Officers Hanks and Grennan, drove to the above address. The building there located was a single-story duplex, with two residences, numbered 307 and 309.

After parking in front of the duplex, the officers went directly to the residence at 309, whereupon they dispersed to appropriate locations surrounding it. Garrahan went to the front door; Hanks went to the rear of the building; and Grennan, to the side. As Garrahan approached the building, he saw a female through an open window, inside the house. On reaching the front door he knocked once, waited a few moments and knocked a second time, waited a period of time and knocked a third time. An-

niece Jones (petitioner's co-defendant and common-law wife) then came to the door. Garrahan identified himself as a police officer. Anniece opened the door and he entered. Anniece did not refuse him permission to do so. He did not force his way into the house. Anniece did not say anything until he was inside. Once inside, Garrahan told Anniece that the officers had information that there was marijuana at the house and asked her if she would mind their looking around. Anniece replied, "My husband is not here. He will be home in about thirty minutes."

During this period of time, Grennan, at the side of the building, was looking through a screened window into the bathroom. He heard Garrahan knocking on the front door, and immediately saw Anniece enter the bathroom and empty something from an ashtray into the toilet and flush it. He did not, however, see what she flushed down the toilet. He immediately stated in a loud voice that Anniece had flushed something down the toilet, walked around to the front of the house, and went inside.

During this same period of time, Hanks was at the rear of the house, where he noticed that the screen was off a "vent hole" underneath the bedroom window of 309, and was alongside said hole. The vent hole was about 12 to 14 inches wide and about eight inches high. About six inches inside the hole he saw a large brown package. He could "readily" see it, standing outside. He reached under the house and got the package, which was about a foot and a half long and six to eight inches in diameter. There were two brown paper bags inside, covering two plastic bags which, in turn, covered a large gray pillowcase. He felt of the pillowcase and felt "a weedy, leafy material" inside one of the bags. He immediately knocked on the rear window and told Garrahan, "The stuff is under the house; place them under arrest."

In the second bag there were two "condoms" containing a white powder, wrapped in a handkerchief. In the package

there was also what looked like a "hypodermic outfit". Hanks then entered the house and conducted a thorough search of it. In a purse which was sitting on a dresser in the bedroom he found a bag which contained numerous green seeds, three packages of cigarette papers and a gas bill made out to petitioner at 309 West 83d Street. He found another purse which Anniece said was hers, which contained two green seeds lying loose in the bottom. He also found two hypodermic needles and an eye dropper wrapped in a piece of paper in a "poker chip box".

Petitioner arrived at the house in a Ford automobile about 4:45 p. m. As he walked toward the front door, Grennan and Hanks stepped out, identified themselves, and asked him who he was. Petitioner identified himself, and was thereupon immediately placed under arrest. Hanks searched the car, and under the dashboard on the driver's side he found one brown paper cigarette.

Officer Grennan had a conversation inside the house with petitioner in which petitioner stated he did not know anything about any marijuana in the house or underneath it. Petitioner admitted knowing that the two needles had been in the house, and claimed that they belonged to a couple of friends of his up north. Petitioner also admitted that he had been "to the joint twice, once for marijuana and once for heroin", but denied that any of the "stuff" belonged to him. He also disclaimed any knowledge about the cigarette found in the car.

The package found under the house contained 20 grams of heroin, four pounds of marijuana and a hypodermic outfit. The seeds found in the purses were marijuana. The cigarette found in the car contained marijuana. All of these items were introduced into evidence over timely and appropriate objection by petitioner. The officers had neither a search warrant nor a warrant for petitioner's arrest.

Both petitioner and Anniece took the stand in their own behalf. Their testimony consisted generally of denials of any knowledge of any of the narcotics which had been found.

■ Petitioner has raised three basic contentions, two of which contain no merit whatsoever. He claims, first, that he was denied the effective aid of counsel in the State court proceedings. The record demonstrates the contrary, showing that petitioner was represented by counsel at all stages of the proceedings, extending from the preliminary examination to and including the appeal from the judgment. The question of the competency of counsel is not reviewable on habeas corpus proceedings in the absence of such a showing of incompetence "as to make the trial a farce and a mockery of justice" (Palakiko v. Harper, 9 Cir., 209 F.2d 75; and Anderson v. Bannan, 6 Cir., 250 F.2d 654). Moreover, petitioner has not presented this contention to the California courts. In the absence of such a presentation, petitioner has failed to exhaust his remedies on that point, and this Court has no jurisdiction to review said contention (Title 28 U.S.C. § 2254).

■■ Petitioner also claims that he has been subjected to double jeopardy. The apparent basis for such contention is that petitioner was originally charged with a violation of Health and Safety Code, § 11500 [possession of marijuana], and that said complaint was dismissed at the preliminary hearing, after which the complaint upon which petitioner's present conviction rests was filed. The apparent basis for said dismissal was the fact that possession of marijuana was, at that time, prohibited not by § 11500, but by § 11530 of the California Health and Safety Code. Not only has petitioner failed to present this argument to the California courts on appeal, therefore preventing either this Court or the California courts from considering said point on habeas corpus proceedings (Title 28 U.S.C. § 2254, and In re Dixon, 41 Cal.2d 756, 264 P.2d 513), but the substantive point raised by petitioner is itself incorrect. Jeopardy does not attach, under

California law, until a defendant has been placed on trial before a court of competent jurisdiction upon a valid indictment or information before a jury duly impaneled and charged with his deliverance (Jackson v. Superior Court, 10 Cal.2d 350, 74 P.2d 243, 113 A.L.R. 1422). The dismissal of the original complaint at the preliminary hearing did not operate as res judicata (See: People v. Prewitt, 52 Cal.2d 330, 341 P.2d 1).

The more substantial point raised by petitioner relates to the allegedly illegal search and seizure proceedings prior to his arrest. The importance of said point stems from the recent decision of the United States Supreme Court in Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081, by which the exclusionary rule, previously applied only to the Federal Government under the terms of the Fourth Amendment (Wolf v. Colorado, 338 U.S. 25, 69 S.Ct. 1359, 93 L.Ed. 1782), was held applicable to the States as well. For purposes of the instant petition, however, Mapp is significant for what it says by implication, rather than expressly. Two points arise in connection with petitioner's petition.

1. It appears to this Court that the logical interpretation of Mapp is that the Fourth Amendment has now been incorporated into the Fourteenth Amendment, and that the law of search and seizure has now been nationalized. The specific holding of Mapp, which leads this Court to the above conclusion, is that,

> "Since the Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth, it is enforceable against them by the same sanction of exclusion as is used against the Federal Government." (367 U.S. at 655, 81 S.Ct. at 1691)

Justice Clark also spoke of "extending the substantive protections of due process to all constitutionally unreasonable searches—state or federal." (367 U.S. at 655, 81 S.Ct. at 1692). As one writer has stated,

> "Since there is only one fourth amendment, there seemingly can be only one interpretation: the Supreme Court should logically supervise interpretation of a federal right. * * * These statements, as well as several others, seem to imply that uniformity is both necessary and desirable; that federal and state courts and officers have a 'mutual obligation to respect the same fundamental criteria in their approaches.'" Collings, Toward Workable Rules of Search and Seizure—An Amicus Curiae Brief, 50 Calif.L. Rev. 421, at 424.

See also: Broeder, The Decline and Fall of Wolf v. Colorado, 41 Neb.L.Rev. 185; Morris, The End of an Experiment in Federalism—A Note on Mapp v. Ohio, 36 Wash.L.Rev. 407; Weinstein, Local Responsibility for Improvement of Search and Seizure Practices, 34 Rocky Mt.L.Rev. 150; and Note, 35 So.Cal.L. Rev. 64.

Parenthetically, it is interesting to note that varying interpretations of the Mapp decision have been set forth by law review writers, and that the interpretations appear to coincide generally with the extent to which the particular State courts have implemented their own rules of search and seizure. Particularly significant is the fact that California authors (in a State which has had extensive experience with the laws of search and seizure, particularly since the 1955 decision of People v. Cahan, 44 Cal. 2d 434, 282 P.2d 905, 50 A.L.R.2d 513) support a narrow reading of the Mapp case, whereas authors from States in which little State activity has been undertaken to define the permissible areas of search and seizure have been particularly outspoken in their expansive interpretation of Mapp. It would appear that a State's own prior decisions tend to color one's reaction to decisions of the United States Supreme Court.

It cannot fairly be said, however, that the Mapp decision stands in a vacuum, with reference to an apparent policy of the Supreme Court to establish a na-

tional search and seizure law. Indeed, that Court, in Elkins v. United States, 364 U.S. 206, at 223–224, 80 S.Ct. 1437, at 1447, 4 L.Ed.2d 1669, specifically stated that,

> "In determining whether there has been an unreasonable search and seizure by state officers, a federal court must make an independent inquiry, whether or not there has been such an inquiry by a state court, and irrespective of how any such inquiry may have turned out. The test is one of federal law, neither enlarged by what one state court may have countenanced, nor diminished by what another may have colorably suppressed."

Although the Elkins case dealt with the use of illegally obtained evidence in a Federal proceeding, where the evidence had been acquired by the actions of a State officer, the decision in Mapp seems to have abolished whatever significance such a distinction might have.

█ It is clear that mere probable cause for belief that certain articles subject to seizure are in a dwelling cannot, of itself, justify a search without a warrant (Chapman v. United States, 365 U.S. 610, 613, 81 S.Ct. 776, 5 L.Ed.2d 828; Jones v. United States, 357 U.S. 493, 497, 78 S.Ct. 1253, 2 L.Ed.2d 1514; Agnello v. United States, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145; and Catalanotte v. United States, 6 Cir., 208 F.2d 264). Since the officers in this situation did not have a warrant, the only possible basis for their search of the premises at 309 must have been as an incident of the arrest of Anniece and petitioner. Nothing which would cause this case to come within the "exceptional circumstances" rule of Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 is made to appear.

█ The language of Elkins, supra, attains decisive significance in the instant situation, in view of the present status of the Federal law of search and seizure. That law requires (with an exception, not here material, involving mov-

ing vehicles; See: Husty v. United States, 282 U.S. 694, 51 S.Ct. 240, 75 L.Ed. 629; and Busby v. United States, 9 Cir., 296 F.2d 328) that an arrest be made *prior* to any search of a defendant or of the area under his possession or control, in order that such search be considered as incident to the arrest (Mosco v. United States, 9 Cir., 301 F.2d 180; United States v. Paroutian, 2 Cir., 299 F.2d 486; Lee v. United States, 98 U.S. App.D.C. 97, 232 F.2d 354; Walker v. United States, 5 Cir., 225 F.2d 447; Papani v. United States, 9 Cir., 84 F.2d 160; United States v. Royster, D.C., 204 F. Supp. 760; United States v. Rutheiser, D.C., 203 F.Supp. 891; and see Rios v. United States, 364 U.S. 253, 80 S.Ct. 1431, 4 L.Ed.2d 1688; and United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653). The California rule, on the other hand, appears to sanction searches as incident to an arrest even if the search occurs prior to the actual arrest, as long as there was, in fact, probable cause to have made an arrest prior to the making of the search (People v. Ingle, 53 Cal.2d 407, 2 Cal.Rptr. 14, 348 P.2d 577; Willson v. Superior Court, 46 Cal.2d 291, 294 P.2d 36; and People v. Simon, 45 Cal.2d 645, 290 P.2d 531).

The logic and language of Mapp and Elkins, supra, do not, in my opinion, permit the continuation of this California rule. Although the California courts have reached an opposite conclusion (People v. Tyler, 193 Cal.App.2d 728, 734, 14 Cal.Rptr. 610), I find it impossible to rationalize the use of two conflicting types of search incident to arrest, in the face of "the same sanction of exclusion" and a "mutual obligation to respect the same fundamental criteria" in this area. If, in fact, in "determining whether there has been an unreasonable search and seizure by state officers * * [t]he test is one of federal law," as is noted by Elkins, supra, I see no legal basis for permitting a search, as incidental to an arrest, to precede that arrest, no matter how appealing the practicalities of the situation might appear. This conclusion, of course, excepts the

above-noted "exceptional circumstances" rule of Johnson. Having reached this conclusion, it becomes incumbent upon me to examine the factual situation pertaining to the arrest here involved.

The California District Court of Appeal stated what it considered to be the main question herein as follows:

"Were the observations of the officers at defendant's [petitioner's] home sufficient to establish reasonable cause for the search?" (183 Cal.App.2d at 385, 6 Cal.Rptr. at 487)

With all deference to that learned Court, it appears to me that the decisive issue here is not whether there was reasonable cause for a search, but rather whether there was an arrest, based upon reasonable cause, before any search was undertaken. Since no search would here have been proper except as incident to an arrest (in this case, the arrest of Anniece), and since any such search must properly have followed the arrest, any search which preceded the arrest must therefore have invalidated the discoveries made thereby, and any discoveries which followed therefrom, under the "fruit of the poisonous tree" doctrine of Silverthorne Lumber Co. v. United States, 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319, and Nardone v. United States, 308 U.S. 338, 60 S.Ct. 266, 84 L.Ed. 307 (See also: United States v. Paroutian, supra, Cochran v. United States, 8 Cir., 291 F.2d 633; Taglavore v. United States, 9 Cir., 291 F.2d 262; Morrison v. United States, 104 U.S.App.D.C. 352, 262 F.2d 449; Work v. United States, 100 U.S.App.D.C. 237, 243 F.2d 660; and Lee v. United States, supra; and Cf. Ramirez v. United States, 9 Cir., 294 F.2d 277).

The California District Court of Appeal found there to have been reasonable cause for the arrest of Anniece, based upon a combination of the anonymous tip, the length of time elapsed before Anniece answered Garrahan's knocks at the front door, the observation by Grennan of her emptying an ashtray into a toilet and flushing it, the assumption that if the officers had seen her she had

seen them, and the fact that Hanks saw the package containing the narcotics under the house. That Court apparently did not consider the entry of the officers onto petitioner's land and the resultant observation of Anniece through the bathroom window, the observation of the package by Hanks, his reaching in and removing the package, the opening thereof, and the resultant discovery of the narcotics, to have been a search. I disagree, for two reasons.

First, the Fourth Amendment has been construed by the Federal Courts to afford protection to an enclosed back yard (Hobson v. United States, 8 Cir., 226 F.2d 890; and see Polk v. United States, 9 Cir., 291 F.2d 230). Spying through a transom from a common hallway after breaking into a rooming house has been held a violation of the Fourth Amendment (McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153). Standing on a man's premises and looking into his bedroom window has been held to be proscribed by the Fourth Amendment (Brock v. United States, 5 Cir., 223 F.2d 681), and so has searching a locked cupboard in a common hallway (United States v. Lumia, D.C., 36 F. Supp. 552). On the basis of the above state of the law, certain language in such California cases as People v. Martin, 45 Cal.2d 755, 290 P.2d 855 [allowing officers to look through a window or a mail chute, and to act upon what they see thereby] becomes at least questionable. Although it is clear that a mere trespass will not invalidate evidence which is discovered in plain sight during such trespass (Mosco v. United States, supra; and Teasley v. United States, 9 Cir., 292 F. 2d 460), the instant case involved, in addition to the trespass, observation of an individual through a bathroom window (It may be that under the recent California decisions, bathrooms and toilets are peculiarly protected, and that therefore this observation would constitute an illegal search even under California law. See: Britt v. Superior Court, 58 A.C. 480, 24 Cal.Rptr. 849, 374 P.2d 817; and Bielicki v. Superior Court, 57 Cal.2d

602, 21 Cal.Rptr. 552, 371 P.2d 288), and the removal and opening of a package from underneath a house. This combination is sufficient to constitute an unreasonable search, under Federal law, which now appears to be applicable to the States.

■ Second, specifically as to the removal and opening of the package, and the discovery of the narcotics thereby, it should be noted that it was only upon the discovery of "the stuff" that Hanks shouted for Garrahan to arrest Anniece. The District Court of Appeal noted that discovery of the package was one of the bases for its finding of probable cause. The discovery of the package, however, was not the last event before the actual arrest of Anniece. Subsequent to said discovery, the package was opened, and the narcotics themselves were discovered. It is inconceivable that the opening of a package which had been concealed in a vent hole under a house would not be considered a search. Since the old California rule that a search, incident to an arrest, may precede the actual arrest if there is in fact probable cause for said arrest, can no longer be accepted, it becomes clear that the search by which the narcotics in the package were discovered violated the Fourth Amendment.

■ Moreover, the facts appear to warrant the conclusion that it was the discovery of the "woody, leafy material" inside the package that actually triggered the arrests in this case. All that appeared from the outside of the house, in back, was a large brown package. The only prior information which might have led the officers to believe that this package contained narcotics was the anonymous tip. Such a tip, alone, clearly provides no basis for an arrest, or a search incident thereto, either under Federal law or California law (Cochran v. United States, supra; Wong Sun v. United States, 9 Cir., 288 F.2d 366; Rodgers v. United States, 9 Cir., 267 F.2d 79; Cervantes v. United States, 9 Cir., 263 F.2d 800; Hobson v. United States, supra; Wrightson v. United States, 95 U.S.App. D.C. 390, 222 F.2d 556; Contee v. United States, 94 U.S.App.D.C. 297, 215 F.2d 324; Worthington v. United States, 6 Cir., 166 F.2d 557; Willson v. Superior Court, supra; and People v. Kitchens, 46 Cal.2d 260, 294 P.2d 17). Any further positive information as to the existence of narcotics on the premises at 309 came from their discovery by Hanks. Since "a search is not to be made legal by what it turns up" (Miller v. United States, 357 U.S. 301, 312, 78 S.Ct. 1190, 1197, 2 L.Ed. 2d 1332; and United States v. Di Re, 332 U.S. 581, 595, 68 S.Ct. 222, 92 L.Ed. 210), the actual discovery of the narcotics by Hanks cannot be used to support a finding of probable cause.

To recapitulate, even assuming, *arguendo*, that probable cause for the arrest of Anniece existed before Hanks' discovery of the narcotics, said discovery can no longer be incident to the arrest. And if Hanks' discovery furnished the basis for the probable cause, the arrest was based on an illegal search, and cannot be upheld.

It should also be noted that the above determination has no necessary effect upon the existing rule that the lawfulness of the arrest without a warrant is to be determined by reference to State law (See: Johnson v. United States, supra; United States v. Di Re, supra; Burks v. United States, 9 Cir., 287 F.2d 117; and Butler v. United States, 9 Cir., 273 F.2d 436). California Penal Code § 836 specifically provides that arrests without a warrant may be made by an officer "[w]henever he has reasonable cause" for certain beliefs. Subdivision 2 of that section, allowing an arrest when the arrestee has in fact committed a felony, also has been construed to require a showing of reasonable cause (People v. Brown, 45 Cal.2d 640, 290 P.2d 528). The instant situation does not specifically involve the question of whether there was a valid arrest. It is, rather, concerned with whether, assuming there was a valid arrest, the searches undertaken were incident thereto.

■ Looking, then, to the searches by Hanks of the house and of petitioner's automobile, it must also be held that said

searches violated the requirements of the Fourth Amendment. If there was, in fact, no probable cause for the arrest until after the discovery of the narcotics in the package, the succeeding arrest was merely incident to that search, under the law which has been applied both by the Federal and the California Courts. As such, the arrest itself cannot support any further searches. Even if, however, the arrest was valid under California law, as being based on reasonable cause prior to Hanks' discovery (I am inclined to doubt the propriety of this conjecture, but the District Court of Appeal, in its decision, left the true basis for the arrest unclear.), the preceding search tainted any subsequent search which might, at that time, be attempted as incident to the arrest (United States v. Paroutian, supra; Taglavore v. United States, supra; and see Silverthorne Lumber Co. v. United States, supra). The controlling rule is succinctly stated in United States v. Paroutian, supra, 299 F.2d at page 489, as follows:

"[A] showing that the government had sufficient independent information available so that in the normal course of events it might have discovered the questioned evidence without an illegal search cannot excuse the illegality or cure tainted matter."

In the instant situation, as in Paroutian,

"even without an unlawful search, the [officers] might have found the [narcotics]. But that is not what happened." (299 F.2d at 489)

It follows, therefore, that the narcotics discovered in the house, subsequent to the arrest of Anniece, and the cigarette discovered in petitioner's automobile, subsequent to his arrest, were discovered through the results of a search which violated the requirements of the Fourth Amendment, as that Amendment has been incorporated into the Fourteenth Amendment of the Constitution of the United States.

2. The effects of the Mapp decision, inasmuch as that decision was based upon an apparent constitutional necessity, must be given retroactive effect. Although I am aware of a specific holding to the contrary (Hall v. Warden, Maryland Penitentiary, D.C., 201 F.Supp. 639), it would appear that the Supreme Court itself has at least intimated that such is to be the result of any decision in which that Court reverses the pre-existing law on constitutional grounds. This general result was reached in Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891, by four members of the majority (Justice Frankfurter, concurring, specifically argued against such a construction.), and was reaffirmed by six members of the Court in Eskridge v. Washington State Board of Prison Terms and Paroles, 357 U.S. 214, 78 S.Ct. 1061, 2 L.Ed.2d 1269. The Mapp decision itself cited Griffin with approval, in connection with the argument that a wholesale release of State prisoners would follow from that decision (Mapp v. Ohio, 367 U.S. at 659, n. 9, 81 S.Ct. 1693, 6 L.Ed. 2d 1081). I do not ascribe the significance to the use of the words "then," "today" and "no longer" in the Mapp case that has been given them by Judge Thomsen in Hall v. Warden, Maryland Penitentiary, supra. For me, the question of the retroactivity of constitutional pronouncements is itself a constitutional question, to be decided by what the Supreme Court has actually done, rather than by the happenstance of language that it may have used in so doing.

The above conclusion brings us to two procedural problems. First, is the question of an illegal search and seizure cognizable by the Federal Courts on an application for a writ of habeas corpus? Prior to Mapp, the question of the propriety of searches and seizures by State officers was a question solely of evidence in California, and, as pointed out by Justice Traynor, concurring, in In re Harris, 56 Cal.2d 879, at 884, 16 Cal.Rptr. 889, at 892, 366 P.2d 305, at 308;

"* * * the lower federal courts have consistently adhered to the rule that the question of unconstitution-

ally seized evidence may not be raised on collateral attack. [citations]"

Although in most of the cases in which the courts have refused to review, on habeas corpus, questions of illegal search and seizure, the petitioners had failed to otherwise exhaust their remedies, the basic theory behind such refusal was that such a question was merely one of evidence, to be determined solely on appeal. Habeas corpus was looked upon solely as a device for attacking the jurisdiction of the trial court (Whelchel v. McDonald, 340 U.S. 122, 71 S.Ct. 146, 95 L. Ed. 141; and Eagles v. United States ex rel. Samuels, 329 U.S. 304, 67 S.Ct. 313, 91 L.Ed. 308). The Mapp case, however, has changed the nature of the inquiry into any allegedly illegal search and seizure. No longer is a mere question of evidence involved. The right to be free of unreasonable invasions of one's privacy has assumed the same constitutional status as the right to counsel and the right to suppress involuntary confessions (See, e. g., Rodgers v. Richmond, 365 U.S. 534, 81 S.Ct. 735, 5 L.Ed.2d 760; Moore v. Michigan, 355 U.S. 155, 78 S.Ct. 191, 2 L.Ed.2d 167; and Leyra v. Denno, 347 U.S. 556, 74 S.Ct. 716, 98 L. Ed. 948). Said right is now to be enforced with the same strictness as are any other constitutional rights. Were the opposite to prevail, as hypothesized in Mapp (367 U.S. at page 656, 81 S. Ct. at page 1692),

> "[t]he right to privacy, no less important than any other right carefully and particularly reserved to the people, would stand in marked contrast to all other rights declared as 'basic to a free society.' "

I conclude, therefore, that questions involving the legality of a search and seizure, by State officers in a State prosecution, are now properly subject to inquiry by Federal courts through the proper habeas corpus procedures.

■ Second, although petitioner has exhausted his remedies, as required by Title 28 U.S.C. § 2254, has he waived the right to present the issue of the legality of the search and seizure, here involved, on habeas corpus? Petitioner took an appeal from the judgment of the Los Angeles Superior Court, which judgment was affirmed by the Second District Court of Appeal on July 29, 1960 (See: People v. Hurst, supra). No timely petition for rehearing, or for a hearing in the California Supreme Court, was filed, nor was there filed a petition for certiorari to review the decision of the District Court of Appeal. Subsequently, petitioner, on January 19, 1961, filed a petition for a writ of habeas corpus with the California Supreme Court, setting forth the same search and seizure points here presented. Said petition was denied without opinion on February 23, 1961. On March 28, 1961, petitioner filed a petition for a writ of certiorari in the Supreme Court of the United States to review said order by the California Supreme Court. Said petition for writ of certiorari was denied on October 9, 1961 (Hurst v. McGee, 368 U.S. 843, 82 S.Ct. 70, 7 L.Ed.2d 41). Petitioner, therefore, has presented his present search and seizure argument to all of the California appellate courts and to the United States Supreme Court. Said presentation, however, was not taken by direct appeal, but rather was a collateral attack through the device of the writ of habeas corpus.

The answer to this question would seem apparent, that no such waiver had occurred, for the reasons set forth in the answer involving the cognizability of the issue of search and seizure on habeas corpus, were it not for footnote 9 of the Mapp opinion. That footnote reads as follows:

> "As is always the case, however, state procedural requirements governing assertion and pursuance of direct and collateral constitutional challenges to criminal prosecutions must be respected. We note, moreover, that the class of state convictions possibly affected by this decision is of relatively narrow compass when compared with [certain cited cases]. In those cases the same

contention was urged and later proved unfounded. *In any case, further delay in reaching the present result could have no effect other than to compound the difficulties."*

The precise meaning of said footnote is certainly unclear, but it appears that a minimal requirement therein set forth is that State remedies be exhausted, as is provided for by § 2254 of Title 28, and that the particular constitutional issue to be presented to the Federal courts be first presented to the State courts. I do not, however, read that footnote as in any way detracting from the conclusions reached concerning the propriety of inquiry into search and seizure questions by habeas corpus proceedings.

IT IS, THEREFORE, ORDERED that petitioner's petition for a writ of habeas corpus be, and the same is, hereby granted. A writ of habeas corpus will issue, and it is ordered that petitioner be discharged from custody.