**C. H. BARTLETT and Henry Grady Armstrong, Appellants,**

v.

**UNITED STATES of America, Appellee.**

**No. 15745.**

United States Court of Appeals
Fifth Circuit.

April 12, 1956.

Walter B. Fincher, Atlanta, Ga., for appellants.

J. Robert Sparks, Asst. U. S. Atty., James W. Dorsey, U. S. Atty., Atlanta, Ga., for appellee.

Before HUTCHESON, Chief Judge, and RIVES and BROWN, Circuit Judges.

RIVES, Circuit Judge.

The appellants were convicted under two counts of an indictment charging bank robbery in violation of 18 U.S.C.A. § 2113(a) and (d) [1] and each was sentenced to imprisonment for twenty-five years.

The most important question presented on appeal is the denial of appellants' motion to suppress certain evidence [2] made on the ground that it had been obtained by means of an unreasonable search or seizure contrary to the Fourth Amendment.[3]

On the hearing of the motion to suppress prior to the trial, testimony was received from appellant Bartlett, and from three agents of the Federal Bureau of Investigation. Bartlett testified that he and Armstrong were arrested by F.B.I. men and police at the Alamo Plaza Motel in Chattanooga, Tennessee early on the morning of March 24, 1955, that he asked to be advised of the charge but was refused, and that at the police station he was refused permission to see a lawyer. He admitted that contained in his and Armstrong's suitcases was $2267.06 in cash, and testified that "I have had the money for many years." He further admitted that he and Armstrong were escaped convicts from the Georgia State Penal System, and had escaped on January 29th. Being asked how he had procured the money between the time of his escape January 29th and March 4th, he replied, "I have talked to my attorney on that count. I believe I am going to refuse to answer that on the ground it might tend to incriminate me." He further testified:

"Q. Isn't it true that you were informed that you had been arrested on a warrant sworn out on January, warrant sworn out on February 8th, 1955, charging you with the interstate transportation of a stolen motor vehicle from Talbotton, Georgia, to Opelika, Alabama, knowing the same to have been stolen, didn't the agents tell you that when they arrested you? A. About, I would say three hours and a half after we were arrested, they made that statement."

He further testified that at 10:30 that same morning he was taken before a federal commissioner who told him that he was charged with violating the Dyer Act,

1. "§ 2113. *Bank robbery and incidental crimes*

"(a) Whoever, by force and violence, or by intimidation, takes, or attempts to take, from the person or presence of another any property or money or any other thing of value belonging to, or in the care, custody, control, management, or possession of, any bank, or any savings and loan association; or

"Whoever enters or attempts to enter any bank, or any savings and loan association, or any building used in whole or in part as a bank, or as a savings and loan association, with intent to commit in such bank, or in such savings and loan association, or building, or part thereof, so used, any felony affecting such bank or such savings and loan association and in violation of any statute of the United States, or any larceny—

"Shall be fined not more than $5,000 or imprisoned not more than twenty years, or both.

* * * * *

"(d) Whoever, in committing, or in attempting to commit, any offense defined in subsections (a) and (b) of this section, assaults any person, or puts in jeopardy the life of any person by the use of a dangerous weapon or device, shall be fined not more than $10,000 or imprisoned not more than twenty-five years, or both."

2. The motion listed all of the evidence seized, except the loaded pistol taken from the glove compartment of the automobile and the rearview mirror removed from the automobile.

3. "Amendment IV—The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

18 U.S.C.A. §§ 2311–2313; that he did not inquire what criminal offense that Act covered; that his bond was set at $5,000.00; that he knew, or had learned since, that the Dyer Act covers transportation in interstate commerce of stolen automobiles. He further testified that on the second or third day after that hearing he was again taken before the United States Commissioner and charged with robbing a bank at Mansfield, Georgia, that, in fact, the F.B.I. agents had mentioned that charge to him, "I would say in a couple, maybe an hour after we were caught." The court sustained objections to an inquiry on cross-examination as to whether he had been driving a 1953 two-tone, green Oldsmobile which was parked in the motel court area when his attorney stated, "We are not contending there was anything seized from the automobile", though Government counsel insisted, "Something was seized from the automobile."

Jack D. Hugulet testified that he was Senior Resident Agent of the F.B.I. at Chattanooga, Tennessee; that on March 4, 1955, he received a telephone call from the main office of the F.B.I. at Knoxville, Tennessee, advising him that a warrant had been issued by the United States Commissioner in Opelika, Alabama, charging Bartlett and Armstrong with the interstate transportation of a Pontiac automobile, knowing it to have been stolen; that they were charged with transporting this car from Talbotton, Georgia, into the State of Alabama; that he was further advised that they might be in possession of a 1953 Oldsmobile sedan, two-tone green, bearing a 1955 Georgia license numbered 42824, which had been seen in the vicinity of Mansfield, Georgia, on or about March 2, 1955, on which date the Bank of Mansfield, Georgia, had been robbed, and was further advised that Bartlett and Armstrong were escaped convicts from Georgia; that they had escaped from the Telfair Prison Work Camp of the State of Georgia. He received this information between midnight and 1 A.M. on March 4th. About 5:30 A.M., he and

other agents of the F.B.I. had located the green Oldsmobile, bearing the license number given him, in the parking lot of the motel.

At the motel office, they found that the two men were registered under names other than Bartlett and Armstrong. With the assistance of officers of the Chattanooga Police Department, the rooms of the motel occupied by the two men were surrounded. Hugulet then telephoned to one of the rooms and informed the occupant that he was a Special Agent of the F.B.I., that he had a warrant for his arrest, and for him to come out of the room with his hands up, and walking backwards. After receiving the second call to the same effect, the occupant emerged in compliance with the order, was arrested, and proved to be Henry Grady Armstrong. After a quick search, he was handcuffed and placed in charge of another agent. Shortly afterwards, Bartlett was likewise arrested. After Armstrong and Bartlett had been arrested and their persons searched, Hugulet instructed other agents to search the rooms occupied by them and to have the Oldsmobile towed to the Chattanooga garage and searched.

Agent Hugulet further testified that he advised both men that the officers were Special Agents of the F.B.I.; that the warrant had been issued for their arrest by the United States Commissioner at Opelika, Alabama; and that they were charged with interstate transportation of a stolen motor vehicle, knowing it to have been stolen; that they did not have to make any statement and that any statement they might make could be used against them; that, when they arrived at the Chattanooga Police Station, he further advised each of them that he was entitled to have an attorney to represent him, but neither requested a lawyer; that the prisoners were carried before the United States Commissioner about 8:30 that same morning; that the warrant had not arrived in Chattanooga and that neither he nor the Commissioner had physical possession of it at that time, but the Commissioner did advise

Bartlett and Armstrong of the substance of the charge contained in the warrant; that he interviewed the defendants concerning their possible participation in the bank robbery on the date of the arrest, on March 4th, but did not advise them that they were being charged with that offense; that a second hearing was had before the United States Commissioner on March 8th, at which time the Commissioner advised the defendants that they were charged with robbery of the Bank of Mansfield, Mansfield, Georgia, on March 2nd.

Frederick J. Dobbratz testified that he was a Special Agent of the F.B.I. located in Opelika, Alabama; that he had investigated a violation of the Dyer Act, by the transportation of a stolen automobile from Talbotton, Georgia, to Opelika, Alabama, and had sworn out a warrant before the United States Commissioner on February 8, 1955, charging Armstrong and Bartlett with that offense, which warrant was introduced in evidence.

Arthur T. Royce testified that he was another Special Agent of the F.B.I. located in Chattanooga, Tennessee; that he helped search Bartlett's person immediately after the arrest and took from his billfold $670.33 and eight two-dollar bills which appeared to be old; that he was present when Mr. Hugulet informed the men at the motel of the charge against them and of their constitutional rights; and that Bartlett told him he had been in possession of the Oldsmobile

since February 14, 1955, and that he had stolen it.

The testimony of Bartlett and of the three F.B.I. agents having been taken, and after hearing argument of counsel, the court overruled the appellants' motion to suppress evidence.[4]

The arrests of the appellants were clearly lawful arrests. Agents of the Federal Bureau of Investigation have authority to "make arrests without warrant for any offense against the United States committed in their presence, or for any felony cognizable under the laws of the United States if they have reasonable grounds to believe that the person to be arrested has committed or is committing such felony." 18 U.S.C.A. § 3052. Since the F.B.I. agents had reliable information of an outstanding warrant charging the appellants with the commission of a felony cognizable under the laws of the United States, 18 U.S.C.A. § 2312, it was not necessary that they should have the warrant in their actual possession in order to justify the arrest. 4 Am.Jur., Arrest, § 66, see also § 22, and 6 C.J.S., Arrest, § 6(b) (2).

As an incident to the lawful arrest of the appellants, the officers had

"The right without a search warrant contemporaneously to search persons lawfully arrested while committing crime and to search the place where the arrest is made in order to find and seize things connected with the crime as its fruits or as the means by which it was commit-

4. Upon the trial, the F.B.I. agents identified the following items of evidence seized in the search of the persons of the appellants and of the rooms from which they emerged and of the automobile:

Eight $2.00 bills found on the person of Bartlett.

$653.00 in cash found on the person of Bartlett.

Eight $2.00 bills found in Room 1206 (from which Armstrong emerged).

$1,340.00 in cash found in Room 1206 (from which Armstrong emerged).

$827.83 in cash, found in Room 1406 (from which Bartlett emerged).

A book of matches with "Crest Motel" printed thereon, found in Room 1406 (from which Bartlett emerged).

A hat and a coat, both found in Room 1406 (from which Bartlett emerged).

An application for Georgia Driver's License, found in Room 1206 (from which Armstrong emerged).

A loaded pistol taken from the glove compartment of the Oldsmobile.

A rearview mirror removed from the Oldsmobile.

Four automobile tires removed from the Oldsmobile.

Georgia License Tag No. F 42824 (removed from Oldsmobile in Chattanooga).

The keys to the green Oldsmobile (found on the person of Armstrong).

ted, as well as weapons and other things to effect an escape from custody." Agnello v. United States, 269 U.S. 20, 30, 46 S.Ct. 4, 5, 70 L. Ed. 145.

The F.B.I. agent in charge had found the men in possession of a 1953 Oldsmobile, two-tone green, sedan, bearing Georgia license tag 42824, and had been advised by his Knoxville office that said automobile had been seen in the vicinity of Mansfield, Georgia, on or about March 2, 1955, and that the bank at Mansfield, Georgia had been robbed on that day. His Knoxville office had further advised him that Bartlett and Armstrong were escaped convicts from Georgia.[5] With all of that information, the agent had reasonable grounds to believe that Bartlett and Armstrong were even then in the process of committing a felony or felonies against the United States,[6] and (if it had not been a useless formality) might have then made arrests for such other felonies. 18 U.S.C.A. § 3052, supra.

Only unreasonable searches and seizures come within the interdiction of the Fourth Amendment, and what is reasonable depends on the facts and circumstances of each case. Harris v. United States, 331 U.S. 145, 150, 67 S.Ct. 1098, 91 L.Ed. 1399. Clearly, we think, with the information in the possession of the arresting officers, their search of Bartlett and Armstrong and of the rooms from which they emerged at the time of their arrests, and their seizure of certain property, including the money which had probably been stolen from the Bank of Mansfield, were entirely reasonable.[7] It follows that both the motion to suppress the evidence seized and the objections on the trial to the introduction of such evidence were properly overruled.

On the trial the defendants objected also to the introduction of the loaded pistol, taken from the glove compartment of the Oldsmobile after it had been towed to the Chattanooga Garage shortly after the arrests, and of the rearview mirror removed from said automobile at that time. There was no such unreasonable delay in searching the automobile as appeared in Rent v. United States, 5 Cir., 209 F.2d 893. Its search was substantially contemporaneous with the arrests. The pistol may well have been the instrument used or ready for use in the commission of each of the crimes. The rearview mirror bore Armstrong's fingerprints. Both were properly received in evidence.

At the time the bank was robbed, only two employees were present, the cashier and a bookkeeper. Both of them were positive in their identification of Bartlett as the man who committed the robbery. They were able to see the top part of an old, black automobile in which he arrived and left and which was parked in front of the bank while the robbery was in progress. There was considerable other evidence, to be mentioned hereafter, connecting,

---

5. That their status as escaped convicts was a circumstance to be taken into consideration in determining the reasonableness of the search, see Martin v. United States, 4 Cir., 183 F.2d 436, 439; Cline v. United States, 5 Cir., 116 F.2d 275, 276; Stroud v. United States, 251 U.S. 15, 21, 40 S.Ct. 50, 64 L.Ed. 103; Price v. Johnston, 334 U.S. 266, 285, 68 S.Ct. 1049, 92 L.Ed. 1356.

6. 18 U.S.C.A. § 2113 constitutes the robbery of certain banks, indeed most banks, a felony against the United States and specifically includes as such felony the taking and carrying away of the stolen money and the possession or concealment thereof. It was possible that they were also committing the offense denounced by 18 U.S.C.A. § 1073, making it a federal felony for a person to travel in interstate commerce with intent to avoid confinement after conviction for certain enumerated major offenses as defined either at common law or by the laws of the place from which the fugitive flees.

7. Harris v. United States, supra; United States v. Lefkowitz, 285 U.S. 452, 465, 466, 52 S.Ct. 420, 76 L.Ed. 877; 47 Am. Jur., Searches & Seizures, § 54; Annotation 169 A.L.R. 1423, and cases supplemental thereto; United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653.

an old, black Ford automobile and the two-tone green Oldsmobile with the robbery. Between 5 and 6 o'clock in the afternoon of the same day of the robbery, the Sheriff of Newton County found a black Ford automobile abandoned in the woods with the front wheels down in a ditch, eight miles from the scene of the bank robbery. This proved to be the automobile of Grady J. Stell of Atlanta, Georgia.[8] Mr. Stell testified that it was stolen from in front of his home sometime between 7:30 P.M. on March 1st, 1955, and 7:30 A.M. on March 2nd, and that the following Friday he went to Covington, Georgia and got the car back. Upon the objection of defendants' counsel to Stell's testimony, "on the ground that it has not been sufficiently identified with either of these defendants, so that the jury could conclude that the automobile was in either of the defendants' possession, and on the further ground that it introduces testimony of a separate and distinct crime," the able and patient district judge cautioned the jury as shown in the margin.[9] The district court was thus correctly following the practice approved by this Court in Montgomery v. United States, 203 F. 2d 887, 891:

"The fact that the evidence objected to tended to establish that the accused committed offenses other than those charged in the indictment would be no justification for excluding it if it tended also to establish the commission of the crime charged in the indictment, Capone v. United States, 7 Cir., 51 F.2d 609, 619, 76 A.L.R. 1534. We think, however, that the jury should have been cautioned that the evidence was admitted only for the light that it might throw on the federal offenses on trial, and that no inference of guilt could be drawn merely from the commission of other offenses different in character."

The appellant complains that the court "instructed the jury on the law as to confessions, there being no evidence that met the requirements of law as to confessions by these appellants or either of them." Actually, the district court did not use the word "confessions". Instead, it correctly instructed the jury as to incriminatory statements as shown in the margin.[10] There were many statements which the jury could reasonably consider incriminatory. Bartlett

8. Atlanta is 55 miles distant from Mansfield.

9. "The Court: Gentlemen, the proof of the facts seeking to connect the defendants on trial, or either of them, with this particular Ford is primarily, if not entirely circumstantial, and the Court will charge you upon the rules of circumstantial evidence a little later on. I want to caution you, however, that defendants, or either of them, are not on trial for the offense of larceny of this automobile; if the circumstantial evidence should indicate that defendants, or either of them, were guilty of larceny of the automobile, it would be necessary to admit such evidence as part of the general plan or scheme contended for by the Government. It is not for the purpose of injecting on the trial of any person for any offense the alleged commission of this other offense, unless the two things are so closely related that the one throws light upon the other. I wish to caution you, gentlemen, on this point, as in everything else in the case, keep your minds absolutely open on the case, as to the guilt or innocence of the defendants. I will admit that evidence, however, as part of what the Government claims was the general plan or scheme upon the part of a defendant, or defendants, to steal one automobile in order to commit a robbery, and to use the automobile for that purpose. I'll say again, that the evidence on that point is circumstantial, and it is for the jury, under instructions of the court, to give circumstantial evidence such weight and credit as under the rules of law it is entitled to. With that explanation I will admit it."

10. "There is evidence in this case of certain alleged incriminatory statements which the Government agents and officers testified were made by the defendants. I charge you that such statements may be considered by the jury in passing upon the guilt or innocence of the defendants, if such statements were freely and voluntarily made by the defendants, without any fear of punishment, or any hope of reward. * * * However, any in-

had claimed the large amount of money found in their possession; he admitted possession of the pistol and of the Oldsmobile which later was traced as having been within a quarter of a mile of the bank just before the robbery. The keys to the green Oldsmobile were found on the person of Armstrong. His fingerprints were identified as taken from the rearview mirror of that car. Armstrong had made a weird claim of loss of memory, that he had struck his head about January 29th, the date of their escape, and that had caused him not to be able to recall any event that had occurred between that time and the time of his arrest. We find no error in the court's charge.

Finally, appellants insist that the court erred in denying their motion for a judgment of acquittal. As has been stated, the evidence against Bartlett was positive and direct. Neither of the witnesses expressed any doubt that he was the man who robbed the bank.

Some eight witnesses testified to various details of seeing two cars come along the road between Mansfield and the place where the black Ford was found abandoned going toward Mansfield on the morning of and prior to the robbery, and coming back headed away from Mansfield after the robbery. Each saw one man in each car. Their descriptions of the cars varied, but two were positive that they were a black Ford and a Green Oldsmobile. One witness had seen the Oldsmobile parked just off a dirt road about a quarter of a mile from Mansfield at a few minutes before nine o'clock on the morning of the robbery, saw a man get out and walk toward Highway 11, and identified that man as Bartlett. Another witness tied that man in as talking with a man in a black 1950 Ford, and then following the Ford with his green Oldsmobile just prior to the robbery. An expert from the F.B.I. Laboratory in Washington compared photographs taken of the tire impressions where the Oldsmobile had been parked and concluded that they conformed with the tires themselves.

On the night, or rather the early morning, before the robbery, Bartlett and Armstrong together had stayed at the Crest Motel, approximately twelve miles from Mansfield, Georgia. Both were positively identified there and were traveling in an Oldsmobile bearing the same tag number as that in their possession when arrested. They were further tied to the Crest Motel by the book of matches found on the search of Bartlett's room, and by the Application for Georgia Driver's License found in Armstrong's room bearing the name James Farley Mitchell, similar to the name J. F. Mitchell used by the men registering at the Crest Motel.

A witness from the Federal Reserve Bank in Atlanta identified two of the five-dollar bills found in the room from which Bartlett emerged as part of certain currency shipped to the Bank of Mansfield on November 18, 1954. $1340.11 was found in the search of the room from which Armstrong emerged. $1480.83 was found in Bartlett's possession. Each had exactly eight two-dollar bills, one of which (found on Bartlett's person) was faded as if it had been through a washing machine or laundry. The cashier of the bank testified that he was positive that the money stolen included exactly sixteen two-dollar bills, one of which he identified with the faded or laundered bill. He was largely corroborated by the bookkeeper.

A careful reading and study of the entire record convinces us that there was ample evidence from which the jury might reasonably conclude that every reasonable hypothesis had been excluded other than the guilt of Armstrong as well as Bartlett, and, hence, that the jury were authorized to believe beyond a reasonable doubt that both were guilty.

criminatory statements that might have been made by either of the defendants after the consummation of the unlawful enterprise, if there were such, could only be entertained as against the person who made such statements, if you find such statements were made, and were freely and voluntarily made."

See Vick v. United States, 5 Cir., 216 F.2d 228, 232.

The able and experienced trial judge was unusually patient and skillfull in conducting the trial. The result is a voluminous record, but one entirely free from error, and which leaves no doubt that a just result has been reached. The judgments are

Affirmed.