Rufus Glenn SISK, Petitioner,

v.

Ward LANE, Warden, Indiana State
Prison, Respondent.

Civ. No. 2920.

United States District Court
N. D. Indiana,
South Bend Division.

June 28, 1963.

William E. Borror, Ft. Wayne, Ind., for
petitioner.

Edwin K. Steers, Atty. Gen. for State
of Indiana, Donald Adams, Asst. Atty.
Gen. for State of Indiana, Indianapolis,
Ind., for respondent.

GRANT, Chief Judge.

Petitioner has filed in this Court a
Petition for Writ of Habeas Corpus. He

asserts that the Writ should be granted because: (1) his arrest was illegal and therefore the consequent search and seizure of his automobile was also illegal, and (2) the search was illegal even if the arrest was proper.

William E. Borror, Esq., a member of the Indiana Bar, was appointed to represent petitioner in these proceedings. Hearings were held on this matter and this Court has also read the original transcript that was filed at the time petitioner appealed his original conviction.[1]

Petitioner was tried and found guilty of first degree murder in the Circuit Court of Gibson County, Indiana, and received a sentence of life imprisonment. Upon appeal the conviction was affirmed by the Supreme Court of Indiana in an opinion which upheld the legality of the arrest and the search and seizure of petitioner's automobile. Sisk v. State (1953) 232 Ind. 214, 110 N.E.2d 627. Certiorari was denied, Sisk v. State of Indiana, (1953) 346 U.S. 838, 74 S.Ct. 60, 98 L.Ed. 360.

Thereafter petitioner filed, in this Court, a petition for Writ of Habeas Corpus. Sisk v. Overlade, South Bend Civil No. 1568. He alleged therein that his arrest and the search and seizure of his automobile were illegal and therefore that he was convicted in violation of the rights guaranteed by the due process clause of the Fourteenth Amendment.

On February 3, 1954, the petition was denied for the reason that the facts alleged were not sufficient to merit the issuance of the Writ. Upon appeal petitioner relied solely on the ground that the search and seizure of his automobile was illegal and that evidence obtained by such search was introduced at the trial over his objection. Sisk v. Overlade (7th Cir., 1955), 220 F.2d 68. He argued that since Indiana had adopted the exclusionary rule "its courts must decide whether a search and seizure was reasonably in conformity with federal constitutional standards." Therefore, when the In-

diana Supreme Court affirmed his conviction and failed to apply the federal standard, petitioner contends that it extended "affirmative sanction" to the illegal action of the Sheriff, in violation of the language in Wolf v. Colorado (1949), 338 U.S. 25, 28, 69 S.Ct. 1359, 1361, 93 L.Ed. 1782, wherein the Court said:

> "Accordingly, we have no hesitation in saying that were a State affirmatively to sanction such police incursion into privacy it would run counter to the guaranty of the Fourteenth Amendment."

Petitioner's argument was rejected on the ground that Wolf v. Colorado, supra, did not require such an interpretation. The Court of Appeals said:

> " * * * We are content to hold that Wolf decided just what the Supreme Court said it decided—' * * that in a prosecution in a State court for a State crime the Fourteenth Amendment does not forbid the admission of evidence obtained by an unreasonable search and seizure.'"

Sisk v. Overlade, supra, 220 F.2d at page 72.

Petitioner's view was also rejected for the reason that:

> " * * * under decisions of the Indiana Supreme Court, where an arrest is valid, considerable latitude is given to search an automobile which the person arrested was using at the time of the arrest, or which the officers had reasonable cause to believe had been used in the commission of a crime." Sisk v. Overlade, supra, 220 F.2d at page 72.

The Court of Appeals affirmed the decision of this Court and the United States Supreme Court denied certiorari. Sisk v. Overlade (1955), 350 U.S. 876, 76 S.Ct. 121, 100 L.Ed. 774.

In the instant petition it is contended that petitioner was convicted of first degree murder in violation of the rights guaranteed to him by the due process clause of the Fourteenth Amendment to

---

[1]. Transcript on appeal from Gibson Circuit Court to the Indiana Supreme Court, filed 30, 1951, and when referred to hereafter in this Order, denominated "T.R.".

the United States Constitution. In support of this contention petitioner again asserts that his arrest was illegal, and therefore, the consequent search and seizure of his automobile was also illegal, and that the search was illegal even if the arrest was proper and that evidence obtained by such search was introduced at the trial over his objection.

The State has filed a Motion to Dismiss wherein it contends: (1) that the questions raised are matters properly presented for review only by direct appeal from the conviction and by certiorari in the United States Supreme Court, and therefore, do not constitute grounds upon which a Federal Writ of Habeas Corpus may properly issue; (2) that the Mapp case has not changed or altered the law applicable when petitioner's earlier petition was denied, and, therefore, since the instant petition presents the selfsame issue, it should be dismissed; and, (3) that even if the Mapp case does change the law which was applicable when petitioner's earlier petition was denied, the instant petition should be dismissed for the reason that petitioner has not exhausted his remedies by presenting to the State courts the questions herein asserted.

██ Although petitioner admits that the questions presented herein were previously before this Court and the Court of Appeals for the Seventh Circuit, he argues that relief is now sought on new grounds which follow from the decision of the United States Supreme Court in Mapp v. Ohio (1961) 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081.

His argument is essentially as follows:

The Supreme Court of the United States in the Wolf case held that the principle of the Fourth Amendment which prohibits arbitrary invasions of privacy, is a fundamental human right embodied in the Fourteenth Amendment. Since Indiana followed the "exclusionary rule" at the time petitioner was tried and when his conviction was reviewed, it was necessary for the Supreme Court of Indiana to decide whether or not the search and seizure was reasonable according to federal standards, and when the Court decided that the search and seizure was reasonable, it erroneously applied federal standards. However, when this Court and the Court of Appeals for the Seventh Circuit were presented with the question of whether or not the search and seizure was reasonable according to federal standards, the answer to the question was never resolved because the Wolf case would not have required the exclusion of evidence found to be illegally obtained. Therefore, since the Mapp case held that evidence obtained by an illegal search and seizure, in violation of the United States Constitution, may not be used in a State prosecution, it is now incumbent upon this Court to resolve the question of the reasonableness of the search and seizure herein complained of according to federal standards.

The issues facing this Court in considering respondent's Motion to Dismiss are ably considered on pages 42–47 in a chapter entitled "Federalism and the Fourth Amendment: A Requiem for Wolf", by Francis A. Allen, Professor of Law, the University of Chicago, published in The Supreme Court Review at page 1. The author refers to the very problem presented in the instant case in footnote 224 on page 46, where he states:

"One of the questions associated with the Wolf case that never received a definitive answer from the Court was whether a conviction obtained in an exclusionary rule jurisdiction might be reversed if the Court found that evidence obtained in violation of defendant's federal rights had been erroneously admitted at the trial. At least one federal circuit court held that this circumstance did not afford basis for federal intervention. Sisk v. Overlade, 220 F.2d 68 (7th Cir. 1955). But cf. Frank v. Maryland, 359 U.S. 360 [79 S.Ct. 804, 3 L.Ed.2d 877] (1959). All such questions are, of course, removed by Mapp, which not only identifies the Fourteenth Amendment rights with those pro-

tected by the Fourth but includes the remedy of suppression among the federally protected rights."

In Hurst v. People of State of California (U.S.D.C.N.D.California, 1962), 211 F.Supp. 387 an opinion containing an extensive discussion of the same questions that are before this Court on respondent's Motion to Dismiss, the Court considered the effect of the Mapp decision and arrived at the following conclusion at page 391:

"It appears to this Court that the logical interpretation of Mapp is that the Fourth Amendment has now been incorporated into the Fourteenth Amendment, and that the law of search and seizure has now been nationalized. The specific holding of Mapp, which leads this Court to the above conclusion, is that,

" 'Since the Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth, it is enforceable against them by the same sanction of exclusion as is used against the Federal Government.' (367 U.S. at 655, 81 S.Ct. at 1691).

"Justice Clark also spoke of 'extending the substantive protections of due process to all constitutionally unreasonable searches—state or federal.' (367 U.S. at 655, 81 S.Ct. at 1692)."

The recent decision of the United States Supreme Court in Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726, substantiates the conclusion of the District Court in Hurst, and also that of Professor Allen. In the Ker case, Justice Clark, delivering the opinion of the Court, 83 S.Ct. at page 1628 said:

"In Mapp v. Ohio, 367 U.S., at 646–647, 657, 81 S.Ct., at 1686–1687, 1692–1693, 7 L.Ed.2d 1081, we followed Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L. Ed. 746 (1886), which held that the Fourth Amendment, implemented by the self-incrimination clause of the

Fifth, forbids the Federal Government to convict a man of crime by using testimony or papers obtained from him by unreasonable searches and seizures as defined in the Fourth Amendment. We specifically held in Mapp that this constitutional prohibition is enforceable against the States through the Fourteenth Amendment. This means, as we said in Mapp, that the Fourth Amendment 'is enforceable against them [the States] by the same sanction of exclusion as is used against the Federal Government,' by the application of the same constitutional standard prohibiting 'unreasonable searches and seizures.' 367 U.S., at 655, 81 S.Ct., at 1691, 7 L.Ed.2d 1081. We now face the specific question as to whether Mapp requires the exclusion of evidence in this case which the California District Court of Appeals has held to be lawfully seized. It is perhaps ironic that the initial test under the Mapp holding comes from California, whose decision voluntarily to adopt the exclusionary rule in 1955 has been commended by us previously. * * * "

It is clear to this Court that petitioner has the right, in light of Mapp and Ker, to have the question of the alleged illegality of the search and seizure decided on its merits. Therefore, we cannot agree with respondent's contention that the instant petition should be dismissed because it presents the selfsame issue previously decided in an earlier petition.

■ Parenthetically, it is the necessary implication of this holding that Mapp should be and is given retroactive effect in the instant case. Hall v. Warden, Maryland Penitentiary (4th Cir. 1963), 313 F.2d 483, reversing D.C., 201 F.Supp. 639; Hurst v. People of State of California, supra, 211 F.Supp. at pages 395–396.

■ In addition, respondent contends that this cause should be dismissed because the questions raised are matters properly presented for review only by di-

rect appeal and do not constitute grounds upon which a federal Habeas Corpus Writ should issue. Suffice it to say on this point that Fay v. Noia (1963) 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837, would require a different conclusion. See also, Hurst v. People of State of California, supra, 211 F.Supp. at page 395.

Finally, respondent argues, in the alternative, that if Mapp does change the law, the petition should be dismissed because petitioner has not exhausted his remedies by presenting to the State Courts the questions herein asserted. Once again, it is sufficient to say that Fay v. Noia, supra, would require a different conclusion.

Therefore, in respect to respondent's Motion to Dismiss, this Court is of the opinion that petitioner is entitled to a hearing on the merits of the questions presented by his contention that his conviction was obtained by the use of evidence seized in violation of his federal constitutional rights. Accordingly, the Motion to Dismiss is hereby denied.

Petitioner contends that the first degree murder conviction was obtained in violation of his rights to "due process" because evidence, obtained by an illegal search, was admitted to his prejudice at the trial, over his objection. His initial argument is that his arrest was illegal, and, as a result, the search and seizure of his automobile was also illegal.

After reading the transcript of the trial in the State Court, this Court believes that the facts surrounding the arrest of petitioner are fairly summarized in the opinion of the Supreme Court of Indiana in Sisk v. State, supra, 110 N.E. 2d at pages 631–632. They are as follows:

"Frank F. McDonald, Sheriff of Vanderburgh County, was notified of the death of Benjamin Harrison Hancock between the hours of 5:00 and 6:00 in the morning of September 3, 1950. He went to Thoni's Service Station, on Highway 41, North, in Vanderburgh County, and there found Hancock's body on the floor of the service station with a pickax driven into his skull. The Sheriff stated: 'After I pulled the pick out of Mr. Hancock's head, and the funeral director was called, we turned the body over and it became very evident to me that Mr. Hancock had been murdered by some one while in the commission of a robbery. Underneath his body were $4.00 in bills neatly folded, apparently in his hands when he was felled.' Mr. McDonald interviewed Kenneth Burlison, an attendant at the service station who detailed to the Sheriff the general operation and procedure in conducting the business, and stated to the Sheriff that there had been a man sleeping at the station, in his automobile, whose name the attendant did not know. He gave a description of the man, but was unable to give a positive identification of the automobile. He told the Sheriff that a man, later identified as Rufus Glenn Sisk, had been at the service station on the morning of September 3rd. Burlison checked out with the deceased at midnight, turning over to him $379.-43, and left the station some time after that, and at that time appellant was at the station. Investigation showed that money was customarily hidden around the service station. Money had been hidden in the compartment of the cigarette machine. The Coroner, according to the Sheriff, fixed the death of Benjamin Harrison Hancock at around 4:00 A.M. on September 3rd. After the body was released, the Sheriff said: 'I assembled my men back to the office. We sat down and started going over the evidence trying to locate the man that had been known to sleep in the automobile there.'

"John Brantley, a city bus driver, communicated with the Sheriff, and stated that a man about six feet tall, weighing between 155 and 160 pounds, approximately 35 years of age, with brown hair and a high

forehead, had talked with him and appeared to be 'drunk, dopey, or silly.' He said that this man wanted to park his automobile at the Star Filling Station and get a cab to go to the airport to charter an airplane. The time of this conversation was fixed at 1:00 A.M. on September 4th. The Sheriff checked with the cab company and learned that the run to the airport was made with the man in question. Investigation at the airport led to the discovery that a man named Rufus Glenn Sisk had attempted to charter a plane for New Mexico.

"From Ira Musgrave, an attendant at the airport, it was learned that a cab driver brought Rufus Glenn Sisk to the airport, and that the man talked with the witness about chartering an airplane to go to New Mexico, and that he told him the approximate cost would be $300. The witness did not state that the appellant gave any reason for wanting to go to New Mexico. He told appellant that he could give him the exact figure in about 30 minutes, and the cab left, and in approximately 30 minutes appellant returned and was given the exact figure—$503.12—for chartering the airplane. He examined his roll of money and counted out $438 to $440 and said that he would return as soon as he got the rest of the money. The witness saw appellant's union cards as he was going through his billfold and noted his name. The name 'Rufus Glenn Sisk' was given to the Sheriff by the witness. The witness identified the automobile in which appellant drove to the airport as a 1935 or 1936 'black or dirty' Plymouth. Appellant told him he was employed by Swift & Co. After this information was received from the witness, a night watchman at Swift & Co., and a Mr. Bunch, a foreman on the docks, were called to the plant where personnel records were checked as to appellant. It was determined that he made $1.30 an hour.

"On the basis of this information, major highways in the county were checked and the officers conducted a search for appellant driving the described automobile.

"The Deputy Sheriff who arrested appellant knew that a robbery had been committed, and that they were looking for appellant for the purpose of arresting him for the crime of robbery. The Deputy Sheriff had obtained the last-known residence of appellant and was watching the neighborhood at the time of seeing appellant enter his automobile. He was apprehended while sitting in his automobile, and the arrest was made there by the Deputy Sheriff without a warrant."

■ ■ The evidence obtained from the search of the petitioner's automobile, admitted at trial over his objection that it was illegally obtained, must be the product of a search incident to a lawful arrest since it is clear that the officers did not have a search warrant. "The lawfulness of the arrest without warrant, in turn must be based upon probable cause * * *." Ker v. State of California, supra, 83 S.Ct. at page 1630.

■ ■ Probable cause has been defined as a "reasonable ground for belief of guilt". "[I]t has come to mean more than a bare suspicion: probable cause exists where 'the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." Brinegar v. United States (1949), 338 U.S. 160, at pages 175–176, 69 S.Ct. 1302, at page 1310, 93 L.Ed. 1879. Upon consideration of the events leading up to the arrest of the petitioner, this Court agrees with the Supreme Court of Indiana that the facts indicate that the arresting officer had probable cause to believe that

petitioner had committed the felony. Therefore, it is the opinion of this Court that the arrest was legal.

Petitioner also argues that even if the arrest was proper, the search of his automobile was illegal. The transcript of his trial reveals that on Labor Day morning, September 4, 1950, Officer Kassel, who was alone at the time, was stationed in his car in the vicinity of the last known residence of the petitioner, a housing project on East Dresden Street in Evansville, Indiana. He spotted what he thought to be petitioner's automobile in the parking lot of the housing project. About 7:00 A.M. after petitioner got into his car, Officer Kassel stepped up and placed him under arrest. He asked a nearby cab to call headquarters for help and shortly thereafter Officers Huckleberry, Denton and Board arrived and petitioner was placed in their car.

Officer Rogers arrived after the petitioner had been placed in the Sheriff's automobile. He went over to petitioner's automobile, where Officer Kassel was standing and looked into it, noticing that it contained a great amount of clothing. In the meantime, Pride Brothers, a private wrecker service which had been summoned, arrived at the scene and petitioner's automobile was attached to the tow truck. Thereafter, the Sheriff's automobile, containing petitioner, proceeded toward the Sheriff's headquarters, followed by the tow truck, in which Officer Rogers was riding. Except for the visual examination of the interior of the car, as above noted, no search of petitioner's automobile was conducted at the moment of arrest, nor at any time before it was towed away. Sheriff McDonald explained: "Due to the gravity of the case and the seriousness of the crime I ordered him into jail immediately and his car came in, as you might say, accompanying him." (T.R. p. 347.) Officer Kassel said that they did not search his car at the scene of the arrest "because it was wet". (T.R. p. 896.)

The Sheriff's car, in which petitioner was riding, and the tow truck arrived at headquarters, approximately one and one half miles from the scene of the arrest, around 8:00 o'clock A.M. Petitioner, who was in the custody of the officers, was walking up the steps of the jail when the tow truck placed petitioner's automobile in the driveway on the premises of the jail. Petitioner was placed in the admitting cage and a search of his automobile was immediately initiated.

Sheriff McDonald testified that he was present when Officers Rogers and Haas started the search and that he received some of the clothing that was removed from the car. He testified that after the clothing was removed he left the scene of the search and the two officers continued the search. Officer Haas testified that Officer Rogers searched the right side of the car and he searched the left side. Officer Rogers testified that they "took off the hubcaps, looked under the hood, and any place we thought something was hidden." (T.R. p. 301.) He said:

> "Well, then we started taking out the clothing and articles in the back seat of the car and passed them on to some of the other deputies and after the clothing was all out and we give it a quick search under the seats and up front, and then we started over the whole automobile. (T.R. p. 908.)

> \* \* \* \* \* \*

> "After all of the articles from inside was moved out of the car, the clothing and so forth, why I started from the right hand side of the car from the back window, and we ran our fingers over every crevice and crack of the car. We took off the hubcaps and went down to the running board and raised up the floor mat and I reached up under the glove compartment over the top of it from the inside and I touched some loose insulation in there, and then as I run my hand further back over the glove compartment I felt this compact stack of something in there and when I pulled it out it was a little package wrapped up with a Sunday

funny paper. * * * " (T.R. p. 909).

The package contained $796.00. The automobile was also checked for fingerprints.

The following Sunday, September 10, 1950, six days after petitioner's arrest, Sheriff McDonald and Captain Harl of the Police Department resumed the search of petitioner's automobile at Pride Brothers Garage. At this point petitioner, who was confined in jail, had been before a Magistrate and charged with a preliminary charge of robbery. Sheriff McDonald testified that:

"(A)fter I had had the car moved from the jail and ordered barricaded in the garage so that no one could get to the car, this mat was taken from the automobile and examined by Captain Harl and myself the following Sunday." (T.R. p. 981.)

He also testified that when the automobile was taken to Pride Brothers on September 4, 1950, it was locked and a rope tied around it. He said that he had the key and that "(T)he car was in my custody." (T.R. p. 983.) He testified that blood was evident in four areas on the rubber mat on the driver's side.

Captain Harl testified that he made an examination on September 10, 1950, to determine the presence of blood on various parts of the automobile. He said that he found blood on the right hand side of the floor mat; on the accelerator and on the side of the right hand part of the front seat. However, he could not state whether the specimens were human or animal blood.

The articles discovered as a result of the search on September 4, 1950 and September 10, 1950, were introduced as evidence by the State and admitted by the trial Judge over the objection of petitioner's counsel. The officers who conducted the search were also allowed to testify, over the objections of petitioner's counsel, concerning the search and the results of tests made on the articles taken from the petitioner's automobile. At all times relevant, it is admitted, and it is also clear from the record, no warrant had been obtained to search the petitioner's automobile.

While there is uncertainty as to the permissible extent of a reasonable search after arrest, the law is clear that if an arrest is proper at least some accompanying search is reasonable. In United States v. Rabinowitz (1950), 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653, the Court held that the evidence obtained by search and seizure without a search warrant is admissible where a lawful arrest has been made, (for example: an arrest by an officer without warrant where he has reasonable ground to believe the arrested person has committed a felony) and the search is incident to the valid arrest. "The practicability of obtaining a warrant is not the controlling factor when a search is sought to be justified as incident to arrest, United States v. Rabinowitz * * *." Ker v. State of California, supra, 83 S.Ct. at page 1634. The law also recognizes that the reasonableness of the search without a warrant, of moving vehicles, is to be judged differently from search of homes. Carroll v. United States (1925), 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543. This is due, in part, to a recognition of the inherent mobility of such "effects". It is also true that where the subject of the search is an automobile, the bars are not let down altogether, especially where the automobile is not the present means of flight.

In United States v. O'Brien (7th Cir. 1949), 174 F.2d 341, a patrol officer noticed a certain truck in a parking lot where large grocery transport trucks were kept. Later he noticed that the transport trucks had been entered. The officer proceeded to a nearby street where he found the defendants who then led him to the above mentioned truck, although they denied ownership. The officer flashed his light in the back of the truck and discovered certain merchandise which he had also seen in the transport trucks. The defendants were taken to the police station where they were locked up. Another officer who was called to the scene examined the trucks after the

defendants left and saw incriminating evidence therein. Two hours later he returned to the station and said to one of the defendants: "If you give me the keys I will say I found them." He got the keys and the truck was driven to the police station where the butter was removed. The defendants filed a Motion to Suppress in the federal trial and the Court of Appeals held that the evidence was legally obtained by the State officers. The Court said:

"* * * The evidence sought to be suppressed, namely, the contents of the truck and the keys to the truck, was obtained by state officers after the arrest and incarceration of the defendants. * * * Since the arrest was lawful, the subsequent acquisition of the keys from Keating and the search of the truck without warrant were also lawful. The fact that the police officers obtained the keys to Keating's truck from him by means of a ruse does not make the use of said keys illegal." (Supra 174 F.2d at pp. 345–346.)

In Bartlett v. U. S. (5th Cir. 1956) 232 F.2d 135, defendants objected to the introduction of a loaded pistol taken from the glove compartment of the car after it had been towed to a garage shortly after they were arrested, and of the rear view mirror removed from said car at that time. The defendants were arrested in a motel and the F. B. I. agent ordered the car, which was parked in the parking lot of the motel, towed to a garage and searched. (Before the arrest the agent had received information that the car had been seen in the vicinity of Mansfield, Georgia, in the possession of the defendants, two days earlier, on the same date that the Bank of Mansfield had been robbed.) The Court said:

"* * * There was no such unreasonable delay in searching the automobile as appeared in Rent v. United States, 5 Cir., 209 F.2d 893. Its search was substantially contemporaneous with the arrests. The pistol may well have been the instrument used or ready for use in the commis-

sion of each of the crimes. The rearview mirror bore Armstrong's finger prints. Both were properly received in evidence." (Supra, 232 F.2d at page 139.)

The Rent case, more extensively discussed later, is the leading case in support of petitioner's position. In that case the automobile was searched after it had been in custody almost ten hours. In Bartlett, it is not clear how much time elapsed before the car was searched after it had been taken into custody.

In Fraker v. U. S. (9th Cir. 1961) 294 F.2d 859, the defendant was arrested by a police officer on the day following a bank robbery. The officer had received a radio message which stated that the defendant was wanted for armed robbery, and which described both the defendant and the car he was driving. The officer searched the interior of the car. The defendant was taken to jail and the car was impounded in a nearby garage. When personal items were removed from defendant at the jail, a key turned up. The defendant told the officers that it opened the trunk. Approximately *one hour and a half* after defendant was first apprehended, two agents of the F. B. I. came to the jail and obtained the key. One of the agents went to the garage and opened the trunk, in which was discovered the money taken from the bank messenger. Based on these facts, it was asserted that the searching of the trunk, without defendant's permission and without first obtaining a search warrant, violated the constitutional prohibition against illegal searches and seizures. The Court said:

"Only unreasonable searches and seizures come within the interdiction of the Fourth Amendment, and what is reasonable depends upon the facts and circumstances of each case. Harris v. United States, 331 U.S. 145, 150, 67 S.Ct. 1098, 91 L.Ed. 1399. Certainly here, in view of the fact that appellant was wanted in connection with a bank robbery, the search was of the car in which he was arrested would not have been

unreasonable had it been conducted in connection with the original arrest. A search may be conducted, extending to agencies within the control of the arrested person, if incident to a valid arrest. United States v. Rabinowitz, 339 U.S. 56, 61, 70 S. Ct. 430, 94 L.Ed. 653. Where the search is not incident to an arrest, search warrants must be procured when practicable. Trupiano v. United States, 334 U.S. 699, 705, 68 S.Ct. 1229, 92 L.Ed. 1663. The question here is whether the search was so disjoined in time from the arrest as to be no longer incident thereto. The key to the trunk of appellant's automobile was not found until personal articles were taken from his person at the time he was booked. It was only at this point that there was an opportunity to search the trunk. The Pomona police took no action as they expected the agents of the Federal Bureau of Investigation to arrive momentarily. When such agents did arrive, they received, inter alia, the key, whereupon they went to the garage where appellant's car was impounded and opened the trunk. In a similar fact situation, such a search has been held valid. Bartlett v. United States, 5 Cir., 232 F.2d 135, 139. We find that this search was not unreasonable in the circumstances presented, and that the opening of the trunk was substantially contemporaneous with appellant's arrest." (Supra, 294 F.2d at p. 862.)

In United States v. Fortier (U.S.D.C. Conn.1962), 207 F.Supp. 516, defendant was charged with unlawful possession of a firearm. Defendant moved to suppress as evidence a sawed-off shotgun seized by the police, after a search of the defendant's vehicle. The defendant was arrested at the scene of a breaking and entering and taken to the State Police Headquarters where he was asked to remove all personal property from his clothes. He admitted that two keys that were in his possession belonged to a car that was used to drive to the scene of the crime. The officer induced him to surrender the key under the false pretense that he would otherwise be required to pay the expense of having his car towed from its parking place near the scene of the alleged crime. At no time did the officer express his intention to search the vehicle. About *two hours* after he was picked up the officer returned to defendant's parked car and proceeded to search the vehicle for stolen loot, etc. In the trunk, the shotgun in question was found and turned over to Federal officials. The Court determined that the arrest was valid, after which it said:

"The real question is whether or not the search was so disjoined from the arrest, in point of time, as to be no longer incident to the arrest. * * The police search action was substantially contemporaneous with the arrest. There was no unreasonable delay. Bartlett v. United States, 232 F.2d 135 (5 Cir. 1956).

\* \* \* \* \*

"It would be no different than if a bank robber were arrested by an officer knowing at the time that the getaway car was parked on another street 250 feet away. Certainly it would not be unreasonable to expect the arresting officer to deliver and formally detain his prisoner at the police station before going back to pick up the vehicle or search it for loot or the tools or weapons of the crime.

" 'A search may be conducted, extending to agencies within the control of the arrested person, if incident to a valid arrest.' Fraker v. United States, 294 F.2d 859, 862 (9 Cir. 1961); United States v. Rabinowitz, 339 U.S. 56, 61, 70 S.Ct. 430, 94 L.Ed. 653 (1950).

\* \* \* \* \*

"This Court finds the search and seizure in this instance reasonable and valid." (Supra 207 F.Supp. at pages 517–519.)

In Rent v. United States (5th Cir. 1954), 209 F.2d 893, the defendants were

arrested, in an automobile, about midnight. They were taken to jail. The officer also took the car into custody with the intention of searching it. The routine processing of defendants was not concluded until about 4 A.M. after which the officers went home "to get some sleep". An actual search of the car was not made until about 10:30 the next morning. At that time the officers found packages containing bulk marihuana concealed above the glove compartment of the car. The Court held the arrests to be valid and went on to say:

"The right to search incident to an arrest is, of course, a limited right. As expressed in several of the cases, it is limited to a search 'contemporaneously' conducted. (Cases cited omitted). The Government has cited us to no case bearing much analogy to the case before the Court." (Supra, 209 F.2d at p. 897.)

The Court went on to note the decision in Carroll v. United States, wherein the Supreme Court recognized that the reasonableness of the search, without a warrant, of moving vehicles is to be judged differently from search of homes. However, the Court said:

"The reason for that difference does not exist in this case. The automobile was at rest, was actually in the custody of the officers, locked, and not likely to be disturbed.

"In support of the validity of the search, the Government cites also Lowery v. United States, 9 Cir., 156 F.2d 153, and Scher v. United States, 305 U.S. 251, 59 S.Ct. 174, 83 L.Ed. 151. In the Lowery case, the defendant was searched upon being taken to the office of narcotics officers for questioning. In the Scher case, it was held that passage of an automobile into an open garage, closely followed by the observing officer, did not destroy the officer's right to search. Neither of those cases would sustain the validity, as an incident to the arrest, of the search made in this case more than ten

hours after the arrest. (Supra, 209 F.2d at pp. 897–898).

\* \* \* \* \* \*

"The Government apparently takes the position that, since the decision in United States v. Rabinowitz, supra, the practicability of procuring a search warrant is not to be considered in deciding whether the search without a warrant was reasonable. We do not understand that the decision in that case went so far. It was there said:

" 'To the extent that Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663, requires a search warrant *solely* upon the basis of the practicability of procuring it rather than upon the reasonableness of the search after a lawful arrest, that case is overruled.' (Emphasis supplied.) United States v. Rabinowitz, 339 U.S. 56, 66, 70 S.Ct. 430, 435 [94 L.Ed. 653].

" \* \* \* [T]he Court said that whether the search was reasonable 'depends upon the facts and circumstances—the total atmosphere of the case.'

"We think that one of the facts and circumstances to be considered in this case is the fact that there was no reason for not submitting to a magistrate the evidence which the officer deemed sufficient to justify a search of the automobile. The need for effective law enforcement is not satisfied as against the right of privacy by any necessity for the officer to take the decision into his own hands. The officer had ample opportunity to apply for a search warrant and in our opinion a search of the automobile without a warrant was not justified." (Supra, 209 F. 2d at page 899.)

In Shurman v. United States (5th Cir. 1955) 219 F.2d 282, a State officer received information by telephone from a Federal Narcotics officer that said Federal officer was informed a car with a certain license number would be coming

from El Paso to Fort Worth carrying narcotics. About noon, the State officer stopped defendants and arrested them solely on the basis of the above information. After they were placed in custody he returned to search the car and found, in the trunk, two packages of marihuana. These packages were later turned over to Federal authorities. The State officer placed the car in storage. The Court said that one of the questions presented is whether the search as conducted by the State officers would be illegal if it had been conducted by federal officers.

"As to the first of these two questions, our recent decision of Rent v. United States, 5th Cir. 209 F.2d 893, we believe to be controlling on the question of the lawfulness of the search by the state officers here. In that case the occupants of an automobile were arrested and the car was taken into custody, locked, and parked overnight in a police parking lot. We held that a search made the next morning without a warrant was unreasonable; even though the officers had grounds which seem as strong as those in the present case to believe there was marihuana in the car, the opportunity after the arrest to obtain a search warrant was a factor to be considered together with those grounds, in determining the reasonableness of the search. So considered, we concluded that the search violated the Fourth Amendment. The lack of a warrant could not be excused, either under the principle of search incident to arrest, the search and the arrest not having been contemporaneous; or under Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543, because the danger that the automobile might be quickly moved from the locality, basic to the Carroll decision, was lacking under these circumstances." (Supra, 219 F.2d at pp. 285-286.)

In a footnote the Court said: "As we interpreted United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653, in the Rent case, the Supreme Court meant there to relax the strict requirement of a search warrant only where a search is made contemporaneously with a valid arrest and of the arrested person and the immediately surrounding premises under his control; or where there is a strong likelihood that evidence will be lost unless an immediate search is made." Footnote 3, 219 F.2d at p. 286. The Court went on to say:

"In the present case, the car had been left beside the highway after the arrest, and not on a police parking lot; and there was evidence that the trunk of the car would not lock; however, the differences between these facts and those in the Rent case do not seem to us a sufficient basis to apply a different rule here. In the present case, the state officer had the car keys and the car was 'not likely to be disturbed', 209 F.2d 897, and this is the same essential state of facts as that in the Rent case. We hold, therefore, that this search was illegal." (Supra, 219 F.2d at p. 286.)

In United States v. Stoffey (7th Cir. 1960) 279 F.2d 924, the Government had obtained a warrant to search the defendant and a tavern wherein they had previously observed activities indicating that defendant was taking bets. The agents did not obtain a warrant for arrest of the defendant or for search of his car. At 11 A.M. five agents entered the tavern. At 11:50 A.M. defendant drove up, parked his car on the street and entered the tavern. The agents identified themselves, searched him and ordered him to empty his pockets. Guards were stationed at the door to prevent anyone from leaving. About 2 P.M. defendant told the agents (twelve by this time) that he drove to the tavern and when they said that they could tow the car away, he gave them his keys. At 2:50 P.M. defendant was formally placed under arrest and taken away. At 2:55 P.M. agents seized and searched the car, finding betting slips.

After being charged with attempting to evade excise tax on wagers, etc., defendant made a Motion, prior to trial, to suppress evidence seized from his automobile. The Court said:

"It is clear that from 11:50 A.M. until 2:50 P.M., this automobile was immobile. From the time that defendant parked the car until he was arrested and led away, he was in the tavern and the car was in the street. While he had the keys to the car in his possession until 2 P.M., he could not get out of the tavern to get into the car, and he was induced by the threat of Vicars that the car would be towed away to turn over the keys. The agents had no search warrant for the car. They had plenty of time to secure a search warrant. The seizure of the car was not incidental to the arrest of the defendant. The arrest both in fact and in law was consummated before the car was seized. There was no risk of the car being driven away while a search warrant was being obtained. (Supra, 279 F.2d at page 928.)

\*   \*   \*   \*   \*   \*

"We are not here confronted with an arrest of defendant in his automobile. Neither are we confronted with a case where law enforcing officers find it necessary to make a search in a moving automobile or one which has been temporarily halted and which may be moved away by the occupant at any moment. The automobile here searched without a search warrant was not in movement and was not occupied by defendant at the time of the search or at the time of his arrest. In fact, the government agents had made it impossible for him to drive it away. Under these circumstances the search of his automobile was unreasonable." (Supra, 279 F.2d at pp. 928–929.)

The Court went on to discuss the cases that recognized that the reasonableness of the search without a warrant of a moving vehicle is to be judged differently from search of homes. The Court then said:

"In direct contrast, in the case at bar, defendant's automobile occupied an established status quo, which made it certain that no risk of escape of the car would have been involved if the officers took time to obtain a search warrant.

"In Johnson v. United States, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L. Ed. 436 Mr. Justice Jackson said:

"'\* \* \* When the right of privacy must reasonably yield to the right of search is, as a rule, to be decided by a judicial officer, not by a policeman or Government enforcement agent.'" (Supra 279 F.2d at p. 929.)

The Court went on to cite, with approval, the "well considered opinion" of the Fifth Circuit Court of Appeals in Rent v. United States, 209 F.2d 893 and quoted verbatim the language at page 899 of that case. The Court held that the use of the seized articles constituted prejudicial error and the trial court was reversed.

Before reaching the question of the reasonableness of the search in the instant case, it is appropriate to consider the recent opinion of the Supreme Court in the Ker case for the light that it sheds upon the issue before this Court as a result of petitioner's contention that the search and seizure was unreasonable. Justice Clark, at page 4613, said that Mapp "\* \* \* implied no total obliteration of state laws relating to arrests and searches in favor of federal law. \* \* \* Mapp did not attempt the impossible task of laying down a 'fixed formula' for the application in specific cases of the constitutional prohibition against unreasonable searches and seizures \* \* \*." Explaining this statement, Justice Clark, 83 S.Ct. at page 1630 said:

"This Court's long-established recognition that standards of reasonableness under the Fourth Amendment are not susceptible of Procrustean application is carried forward

520

when that Amendment's proscriptions are enforced against the States through the Fourteenth Amendment. And, although the standard of reasonableness is the same under the Fourth and Fourteenth Amendments, the demands of our federal system compel us to distinguish between evidence held inadmissible because of our supervisory powers over the federal courts and that held inadmissible because prohibited by the United States constitution. We reiterate that the reasonableness of a search is in the first instance a substantive determination to be made by the trial court from the facts and circumstances of the case and in the light of the 'fundamental criteria' laid down by the Fourth Amendment and in opinions of this Court applying that Amendment. Findings of reasonableness, of course, are respected only insofar as consistent with federal constitutional guarantees. * * * The States are not thereby precluded from developing workable rules governing arrests, searches and seizures to meet 'the practical demands of effective criminal investigation and law enforcement' in the States, provided those rules do not violate the constitutional proscription of unreasonable searches and seizures and the concomitant command that evidence so seized is inadmissible against one who has standing to complain. * * * Such a standard implies no derogation of uniformity in applying federal constitutional guarantees but is only a recognition that conditions and circumstances vary just as do investigative and enforcement techniques."

■■■ Applying the principles of the Ker case and the decisions heretofore cited, this Court must decide whether or not the search which produced the evidence was lawful as incident to the arrest in light of the facts and circumstances of the instant case.

Petitioner was arrested in his automobile and although a search was not conducted at the scene of the arrest, the officers did note that the automobile contained a large amount of clothing and they did begin the search immediately after they were able to take petitioner and his automobile to the station. The time that elapsed between the arrest and the search was in no sense caused by any delay on the part of the officers, but rather, was occasioned by the exigencies of the situation. The lapse of time was justified on the ground that the officers who had investigated the crime felt that petitioner should be transferred immediately to the jail and that his automobile, which was filled with clothes, should not be touched until it, too, had been taken to the station. There was no such unreasonable delay in searching the automobile as appeared in Rent v. United States, supra.

The fact that the officers resumed the search some six days later, does not detract from the validity of the search, or, in fact, in itself constitute an illegal search. This search, which was legal in its inception, does not become illegal because the Sheriff, who had continued supervision of the automobile, later on resumed the search. There is no evidence that would indicate that anyone had the opportunity to place anything in the car. In fact, the car, which was stored in a private garage, was locked and a rope was tied around it.

It is the opinion of this Court that the search of petitioner's automobile was reasonable as an incident of a lawful arrest. The place of the search was petitioner's automobile which he was occupying at the time of his arrest and which had been identified as the vehicle parked outside of the filling station on the night of the robbery. The automobile was under his immediate control and the officers had the right to take into custody and examine the tangible evidence or instruments of the crime, whether upon the person of the petitioner or within his present or immediate possession.

It is the conclusion of this Court that the rights guaranteed to the petitioner by the United States Constitution have not been violated, and therefore,

It is ordered, adjudged and decreed, that petitioner's application for Writ of Habeas Corpus be, and the same is, hereby, denied.